## 36930. TANNER v. THE STATE.

HILL, Presiding Justice.

Defendant appeals from the denial of his extraordinary motion for a new trial based on newly discovered evidence. This court affirmed his murder conviction and life sentence in *Tanner v. State,* 242 Ga. 437 (249 SE2d 238) (1978). Defendant's earlier appeal did not raise the general grounds and thus, the facts were not detailed in that opinion. Since defendant now alleges newly discovered evidence, it is necessary to review the evidence at the original trial to determine the effect of the newly discovered evidence.

Edna Roper Pendley testified that she was an eyewitness to the murder. She is the former wife of defendant and the daughter of the victim, John Roper. On the night of the murder, Ms. Pendley and the defendant, then married but in the process of getting a divorce, went to a local nightclub where they had an altercation. Ms. Pendley denied having had more than one drink and being drunk but testified that the defendant had been drinking since early that afternoon.

(The defendant testified that both of them had been drinking all day.)

Ms. Pendley testified that she left the nightclub after her husband slapped her for dancing with another man. She drove to her father's house, which was around the block from her house, because she feared that the defendant would harm her. According to her, the defendant arrived at her father's house approximately one-half hour later and sounded his horn twice. The victim came out of his house, went to the passenger-side of the car where the window had been completely rolled down and invited the defendant into the house. Ms. Pendley testified that she was standing beside the victim when she saw the defendant point a shotgun in the victim's face and heard the defendant threaten the victim's life.

According to Ms. Pendley, she told the victim to come back into the house because she thought that the defendant would execute the threat. The victim then went "back in the house [and] Hugh Tanner shot him in the back."[1] According to her, the defendant shot the victim from the passenger side window of the car. She testified further that the victim walked several feet after being shot before he fell.[2] She then ran outside to the victim's side, attempted but failed to detect a wrist pulse and exclaimed that her father was dead.[3] After she returned to the house to telephone an ambulance, the defendant stood silently beside her. She testified that the defendant cocked and reloaded the shotgun inside the house. Shortly thereafter, the police arrived.

Ms. Pendley testified that the victim did not have a gun when he went to the car[4] and that it was very unusual for the victim to approach an unfamiliar vehicle when someone drives up and sounds his horn.

---

[1] Ms. Pendley changed her testimony to explain how the victim ended up outside on the ground when the defendant allegedly waited until the victim went "back in the house" to shoot him.

[2] Expert testimony of the forensic pathologist revealed that a person inflicted with wounds such as the victim received could not walk and that any movement by such a victim would have been the result of the impact from the shotgun blast.

[3] It is unclear exactly when Ms. Pendley returned to the house since she testified that she was standing beside the victim when she heard the defendant threaten the victim and saw the defendant point the shotgun at the victim.

[4] She knew exactly where the victim's two handguns were kept in his bedroom. When the police arrived, only one gun was located where Ms. Pendley said it should have been. The other gun, identified as belonging to the victim, was found locked in the glove compartment of the defendant's car. Although the defendant sought to explain how the gun came to be in his car, he did not explain how it got in the locked glove compartment.

On cross examination, Ms. Pendley testified that the defendant turned off his headlights; that the defendant moved over to the passenger seat and stuck the gun in the victim's face; that she shouted from the screen door of the porch for the victim to return to the house; and that the victim turned to return to the house when the defendant shot him in the back. Ms. Pendley also testified on cross examination that the defendant aimed and shot the victim from the car and that the defendant never got out of the car until after the victim was shot.

The autopsy showed that the victim was shot in the upper left side of the back. Kelly Fite, a firearms expert, testified that the victim was shot from a distance of about 20 feet. Others placed the distance at 16 to 18 feet.

The first officer on the scene testified that the victim's body was in front of and toward the house from the defendant's car. He testified also that the defendant responded to Ms. Pendley's accusation "You killed my daddy" by saying: "Yeah. I killed the old son-of-a-bitch. He had it coming. He shot at me one time. I killed him."[5] The officer testified that he found the victim's loaded pistol locked in the glove compartment of the defendant's car.

The defendant testified on his own behalf, alleging self-defense. He testified that upon leaving the nightclub, he went to his father's house where Ms. Pendley called and asked him to pick her up at the victim's house. When he arrived, he blew his horn and Ms. Pendley came to the door. He rolled down the window on the passenger side to hear her say that she would be out in a few minutes. After she went back inside, the victim came out of the house and up to the car window on the passenger side.

According to the defendant, the victim pulled out a pistol and said, "I am going to kill you." The defendant, however, jumped out of the car door on the driver's side with his shotgun.[6] Three things happened almost simultaneously: as the defendant left the car, the victim no longer had a target; when the defendant got out, he ran toward the front of the car with his shotgun; and the victim also ran toward the front of the car. That the defendant was standing in front of the car with a shotgun in his hands surprised the victim. The victim then "threw his hands up and jumped back." Thinking that the victim was going to shoot him, the defendant fired at the same time

---

[5] There was testimony to the effect that on an earlier occasion the defendant had shot at the victim with a shotgun and that the victim once shot at his daughter thinking he was shooting at the defendant.

[6] The defendant said he had put the shotgun in the car that day to go shooting "down at the river."

that the victim jumped back. When defendant fired, the victim was standing in the headlight beams of the car. Defendant further testified that as soon as he fired, the victim fell to the ground.

After the shooting, the defendant cocked and reloaded his shotgun.[7] He went to see how badly injured the victim was. The victim told the defendant that he was not hurt badly. The defendant then took the victim's pistol out of his hand, threw it in the car and placed some padding under the victim's head.

In rebuttal Ms. Pendley denied having called the defendant at his father's house and asking him to come for her.

The jury found the defendant guilty of murder.

At the hearing on the extraordinary motion for a new trial, the defendant's father testified that on the night of the murder, Ms. Pendley called twice, looking for the defendant.[8]

Tony Lamar Nichols, defendant's nephew, also testified at the hearing, claiming to be an eyewitness. According to Nichols, his car broke down on the night of the murder near the victim's residence. He set out to walk from his car to his great-uncle's house and saw the defendant drive by. He called out to the defendant but was not heard. Nichols testified that he saw the defendant drive into the victim's driveway.

While walking up the street toward the defendant, Nichols observed the victim come out of the house and heard him shout. He could not determine what the victim said, however. Nichols positioned himself directly across the street from the victim's driveway so that he could not be seen. From this view, Nichols testified that he saw the victim approach the front of the car with his left hand raised to keep the glare of the headlights out of his eyes;[9] that the victim aimed at the defendant with a pistol; that the defendant slid out of the car on the driver's side; and that the defendant shot the victim. Nichols further testified that the porch light was on; that Ms. Pendley was not on the porch before or during the incident; and that after the shooting, she came out of the house shouting "You shot my daddy, you killed my daddy."

Nichols testified that he stayed until after most of the police had

---

[7] Ms. Pendley testified that the defendant reloaded the gun inside the house. An investigating police officer testified that he found a shotgun shell outside the house.

[8] This testimony could have been procured sooner by due diligence since the trial attorney knew that defendant contended (1) that he was at his father's house, and (2) that Ms. Pendley called him there.

[9] Ms. Pendley testified that the headlights were not on; the defendant and Nichols testified that they were on.

gone. He stated that he said nothing about the incident because he had held a grudge against the defendant.[10] Nichols testified that he was coming forward due to a change of heart and because he was trying "to live right."

On cross examination, Nichols testified that he did not know why the victim came out of the house. Although he remembered that the defendant had blown his horn, Nichols would not testify that that was the reason the victim came outside.

Nichols testified that he could see what transpired because both the headlights and the porch light were on, although he did admit momentarily losing sight of the victim when he fell to the ground from the shotgun blast. Nichols repositioned himself so that he could see the defendant put an item of clothing under the victim's head, and take the pistol out of the victim's hand and throw it in the front seat of defendant's car. Nichols stated that he would be surprised if he learned that the gun had been found locked in the glove compartment.

On cross examination, Nichols could not recall exactly what he had worn on the night of the incident. Because he always wears blue jeans, Nichols testified that he must have had on blue jeans and a shirt on the night in question. He did not respond when the assistant district attorney brought to his attention that it was 17° F. on that night. Nichols first testified that he had discussed the case with no one. He then testified that he told the defendant that he was going to "confess" as to what he had seen.[11] The prosecutor then introduced three 1973 convictions wherein Nichols had been indicted and had pleaded guilty.[12]

On redirect examination, Nichols testified that since the 1973 convictions, he has not been indicted or convicted. When asked whether he was now "living right" he answered: "No sir. I am not living right now. . . . [But] I was." Nichols explained that he was living right for about six months, that he "sort of backslid a little bit," but that he was telling the truth to the court.

Ms. Pendley testified at the hearing that the defendant slid over to the passenger seat to fire at the victim out of the passenger window, that the defendant is lefthanded, and that the defendant and victim were 8 feet apart when the defendant shot the victim.

We now address the defendant's enumerations of error and

---

[10] The defendant "went off with a girl that [Nichols] was going to marry."

[11] The extent of this discussion between the defendant and Nichols is not indicated.

[12] The convictions include robbery, theft by deception and theft by taking.

contention that his extraordinary motion for a new trial should have been granted.

1. Defendant contends that the trial court erred in denying his extraordinary motion for a new trial based on newly discovered evidence. The trial court ruled that the six requirements of *Bell v. State,* 227 Ga. 800, 805 (183 SE2d 357) (1971), had not been met inasmuch as the new evidence would be cumulative or impeaching and it was not reasonably apparent that the new evidence would produce a different result. Defendant asserts that each of these errors violates his "right to due process of law and equal protection rights guaranteed him under the Georgia and United States Constitutions."[13]

On motion for a new trial based on newly discovered evidence, it is incumbent on the movant to satisfy the court: (1) that the newly discovered evidence has come to his knowledge since the trial; (2) that want of due diligence was not the reason that the evidence was not acquired sooner; (3) that the evidence was so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness is attached to the motion or its absence accounted for; and (6) that the new evidence does not operate solely to impeach the credit of a witness. *Bell v. State,* supra; *Timberlake v. State,* 246 Ga. 488, 491 (271 SE2d 792) (1980), and cits. All six requirements must be satisfied before a new trial will be granted. *Timberlake v. State,* supra, 246 Ga. at 491 and cits.

The new witness, Nichols, the defendant's nephew, related the facts as being basically the same as testified at trial by the defendant. Thus the new witness' testimony was cumulative of the defendant's and impeaching of Ms. Pendley. The state's eyewitness' testimony was partially contradicted at trial and more so by the new witness. Nevertheless, two facts are undisputed: (1) It was the defendant who shot the victim, and (2) the victim was shot in the back. Moreover, the defendant's incriminating admission made on the night of the shooting shows malice and does not raise the issue of self-defense as of the moment of the actual shooting. We therefore are unable to find as a matter of law that the trial judge erred in finding that the new evidence was not so material that it would probably produce a different verdict.

Each case of newly discovered evidence must be judged on its

---

[13] Since defendant has not cited authority for nor supported with argument the alleged due process and equal protection violations, they are deemed abandoned. Supreme Court of Georgia, Rule No. 45.

own facts. Defendant relies primarily on three cases in which motions for new trial based on newly discovered evidence were granted. In *Banks v. State,* 235 Ga. 121 (218 SE2d 851) (1975), the evidence was wholly circumstantial as to whether the defendant shot the victims. The evidence in the case now before us is not circumstantial as to this critical fact. Moreover, *Banks* was based in part on the apparent violation of Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), by the suppression by law enforcement officers of the identity of the new witness (see 235 Ga. at 125), whereas no such violation appears here. Similarly, in *Lee v. State,* 146 Ga. App. 189 (245 SE2d 878) (1978), the new witness had given his name and address to police but his name was not disclosed in response to the defendant's motion (146 Ga. App. at 191). Although the defendant in *Lee v. State* admitted the shooting, the armed victim in that case was shot from the front. See also *Griffin v. State,* 242 Ga. 51 (247 SE2d 853) (1978), distinguishing *Banks* and *Lee,* supra. (The writer of this opinion hereby withdraws his dissent in *Griffin v. State,* supra.)

In *Walters v. State,* 128 Ga. App. 232 (196 SE2d 363) (1973), it appears that the new witness would testify that at the moment the shots were fired, the victim or his companion had what appeared to be a pistol in his hand. There is no suggestion that the defendant in *Walters,* supra, either shot the victim in the back or made an incriminating statement thereafter. None of the cases relied upon by the defendant demands reversal of the order denying the extraordinary motion for new trial.

2. In its order denying the extraordinary motion for new trial, the trial court concluded that the requirements of *Bell v. State* had not been satisfied. We agree (see Division 1, above). However, the trial judge also stated that he could consider the credibility of the new witness, citing *Van Scoik v. State,* 142 Ga. App. 341 (235 SE2d 765) (1977). The defendant urges that it was error for the trial court to consider the credibility of the new witness as such credibility is an issue for the jury. Defendant relies on *Bell v. State,* supra, 227 Ga. at 806, 809; and *Walters v. State,* supra, 128 Ga. App. at 234. We need not here decide whether the *additional reason* given by the trial judge for denying the motion was valid, because we heretofore have affirmed the trial court upon the principal ground of denial, *Bell v. State,* supra.

3. Defendant's remaining enumeration of error is based upon an over-reading of an inconclusive comment made by the trial court during closing argument of counsel at the motion hearing before the court. During defendant's counsel's argument as to the credibility of Ms. Pendley, the prosecutor interrupted. Defense counsel asked that

he not be interrupted during argument. The court stated: "I might state to you that I am going by the evidence as I see it, the law as I see it. Your argument is not going to mean a great deal to me." This statement amounted to little more than that the judge was bound by the law and the evidence rather than by the argument of counsel. This is substantially what jurors are instructed as to the argument of counsel in jury cases. The judge did not say he would not consider counsel's argument and the court did not curtail counsel's argument. We find no error here.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 9, 1981.

*Everett, Persells & Henderson, William L. Henderson,* for appellant.

*Larry Salmon, District Attorney, William Boggs, Assistant District Attorney, Arthur K. Bolton, Attorney General,* for appellee.