A99A0419, A99A0459. WESLEYAN COLLEGE v. WEBER et al.;
and vice versa.
(517 SE2d 813)

ELDRIDGE, Judge.

Wesleyan College ("Wesleyan") owns a narrow strip of land between four-lane Forsyth Road (U. S. 41) and a parallel railroad. This strip of property was across the highway from Wesleyan's president's house. Such strip was undeveloped and contained a large number of trees, primarily loblolly pines.

On February 7, 1995, at approximately 7:45 p.m., Paulette Weber was killed when one of the pine trees fell across Forsyth Road in front of her car, causing her to crash into the tree blocking the roadway. The tree was 94 feet tall and was approximately 47 feet from the edge of the road within the strip. The tree was 18 inches in diameter. Heavy vines and undergrowth surrounded the tree, and vines grew up the tree. In the general area where the tree fell, the trees looked blighted, and there were 15 to 25 trees that were leaning, looked dead, or had fallen. Prior to the incident, laypeople had observed dead trees in this area of the strip, and the bad condition of the trees should have been readily apparent to a non-expert. Not far from the fallen tree, a tree leaned out over the road. Many trees were covered with heavy vines that robbed moisture and blocked sunlight, so that the tops of the trees had little more than a small green fringe on them. Some 70 to 85 percent of the tree canopy surrounding the fallen tree was dead. Hartel, Wesleyan's expert, counted 19 dead trees in the area of the fallen tree.

On the railroad side of the fallen tree in question was a four-foot-long rotten cavity two feet above the base of the tree. Such rotten cavity had existed between ten and fifteen years. Tree fungus had entered the point of damage and traveled in all directions, including the root system. The tree was nearly dead, and root rot had destroyed the root system. Root rot caused the tree to fall; however, expert opinion differed as to whether the rotten cavity caused the root rot. The tree was down an embankment, and vines covered the cavity; the cavity was not observable from the road because of its location. The cavity was observable from the railroad side, which could be reached by crossing 50 feet from the roadway. A layperson in a walk-by could see the cavity in the winter or when leaves were not on the vines. The root rot was not observable externally. The man who cut up the tree testified that trees next to the fallen tree looked dead from the base to the top, sawed like they were rotten, and had little bark on them. The expert testimony was that the tree was actually alive and had few green needles at the top, although it was not healthy, but other witnesses testified that they saw no green needles on or around the tree. The tree crown growth was between a five and ten percent ratio

to the entire height of the tree. A healthy loblolly pine should have a green leafy crown between 25 and 30 percent of the tree. The tree was between 35 to 40 years old, which was approximately halfway through its normal life span. The tree was in a state of decline. A cross section of the trunk showed growth in each year of its life; however, in recent years the growth rings had become smaller and smaller, almost merging, which indicated that the tree was not healthy. From the growth rings, it was apparent that the tree had been damaged in its tenth year of growth, which moderated the growth over the next eight years, and in the last nineteen years of life, the growth rings showed a decline; the last six years of growth rings showed an advanced state of decline. According to the Wesleyan expert, the bark was tight, intact, and free from pine beetle infestation, but laywitnesses stated that the bark was dead, brown looking, and bug eaten. The core, where the city workers cut it from the road, appeared rotten.

Starley, a motorist who first collided with the tree, did not consider the weather "real windy," although it made the trees move, but not "bad weather" or "blowing real hard." Meteorologist Laing reviewed 25 sites across the state and Bibb County on the date in question and found maximum gusts of wind no greater than 35-40 mph; this was a brisk wind. From his experience, it took winds in excess of 60 mph to knock over a healthy tree; and winds in excess of 58 mph are classed as a "severe thunderstorm." Winds of 35-40 mph were not uncommon throughout Georgia in February.

Wesleyan occupied a 200-acre campus, and part of the campus was heavily wooded. The strip where the tree fell was away from the main campus. The ground crew took down trees as necessary; however, after a piece of tree removal equipment failed, Wesleyan used an outside tree service.

William Singleton was the leader of the grounds crew and reported to Don Boughton, Physical Plant Director. While inspecting the strip before the incident, Singleton observed a dead and leaning tree in the general area of the fallen tree and reported this and numerous other dead and dying trees in the area of the fallen tree to Boughton. Boughton asked if Singleton could cut down the trees, but Singleton told him that traffic would have to be stopped to take down the trees, so it was not done. Boughton testified that Singleton's report came after the incident. However, Singleton could not identify the fallen tree as the dead and leaning tree. An expert witness testified in his opinion that the tree that fell had not been leaning prior to the fall. A defense expert witness stated that in his opinion he would not have advised the cutting down of the tree prior to its fall.

On February 7, 1997, Thomas Weber, individually and as next of kin, surviving spouse, and administrator of the estate of Paulette

Weber, deceased, brought suit against Wesleyan in the Bibb Superior Court. The jury tried the case from January 8 through 13, 1998, and returned a substantial verdict. Wesleyan moved for judgment notwithstanding the verdict or, in the alternative, a new trial. On June 22, 1998, the trial court denied the j.n.o.v. but granted the new trial on the grounds of newly discovered evidence. Both parties sought discretionary appeals, which were granted.

*Case No. A99A0419*

Wesleyan contends that the trial court erred in denying its motion for directed verdict and for j.n.o.v., because the tree had no "visible, apparent, and patent" decay sufficient to give rise to a duty to cut down the tree and provide notice of a premises defect. We do not agree.

> The standard[s] for granting a directed verdict or a judgment notwithstanding the verdict are the same. Where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed. OCGA § 9-11-50 (Code Ann. § 81A-150). In reviewing grant of a directed verdict or a judgment notwithstanding the verdict, we must decide whether all the evidence demanded it, or whether there was some evidence supporting the verdict of the jury. *Bryant v. Colvin*, 160 Ga. App. 442 (287 SE2d 238) (1981). A judgment notwithstanding the verdict is improperly granted in the face of conflicting evidence, and an appellate court must view the evidence in the light most favorable to the party who secured the verdict. Id.

*Pendley v. Pendley*, 251 Ga. 30-31 (302 SE2d 554) (1983).

As owner and occupier of the strip of land, Wesleyan had a duty to keep the premises and approaches safe for persons placed in danger from a dangerous condition on the premises. OCGA § 51-3-1. Thus, approaches to the strip include property along the adjoining highway. See *Motel Properties v. Miller*, 263 Ga. 484, 486 (2) (436 SE2d 196) (1993); *Todd v. F. W. Woolworth Co.*, 258 Ga. 194, 196-197 (1) (366 SE2d 674) (1988); *Elmore of Embry Hills v. Porcher*, 124 Ga. App. 418, 419-420 (183 SE2d 923) (1971). The owner of the premises is under a duty to make a reasonable inspection of the premises to protect invitees. *Fulton Ice &c. Co. v. Pece*, 29 Ga. App. 507, 515 (1) (116 SE 57) (1923). However, the common law duty as to individuals who are not on the premises at the time of injury but are injured by a dangerous defect on the premises differs.

"This is well illustrated by the cases of dangerous trees. It is still the prevailing rule that the owner of rural land is not required to inspect it to make sure that every tree is safe, and will not fall over into the public highway and kill a man, although there is already some little dissent even as to this, and at least if the defendant knows that the tree is dangerous he will be required to take affirmative steps. But when the tree is in an urban area, and falls into a city street, there is no dispute as to the landowner's duty of reasonable care, including inspection to make sure that the tree is safe. The cases of trees therefore suggest that the ordinary rules as to negligence should apply in the case of natural conditions, and that it becomes a question of the nature of the locality, the seriousness of the danger, and the ease with which it may be prevented." . . . "A landowner who knows that a tree on his property is decayed and may fall and damage the property of an adjoining landowner is under a duty to eliminate the danger, even if the tree grew on and became part of the land by natural condition." . . . We are specifically limiting liability in this case to patent visible decay and not the normal usual latent micro-non-visible accumulative decay. In other words, there is no duty to consistently and constantly check all pine trees for non-visible rot as the manifestation of decay must be visible, apparent, and patent so that one could be aware that high winds might combine with visible rot and cause damage.

(Citations omitted.) *Cornett v. Agee*, 143 Ga. App. 55-57 (237 SE2d 522) (1977); accord *Wade v. Howard*, 232 Ga. App. 55, 58 (499 SE2d 652) (1998); *Willis v. Maloof*, 184 Ga. App. 349, 350 (2) (361 SE2d 512) (1987). "The only duty imposed upon defendant was that of the reasonable man; defendant would not be charged with the knowledge or understanding of an expert trained in the inspection, care and maintenance of trees." Id. at 350-351; accord *Wade v. Howard*, supra at 58.

(a) The evidence raised an issue as to "visible, apparent, and patent" decay, because there existed a four-foot-long rotten cavity two feet above the base of the tree trunk. While the tree's fall was caused by root rot and not the rotten cavity, the landowner was charged with the knowledge and understanding of a reasonable person. Thus, a four-foot-long cavity observable to a layperson in a ninety-four-foot-tall pine would raise a jury question as to whether or not the tree was seriously diseased and dangerous. *Willis v. Maloof*, supra at 350-351; *Wade v. Howard*, supra at 58. While the expert opinions differed as to whether the rotten cavity caused the root rot and whether the tree

should be taken down, such evidence created a jury question that was resolved adversely to Wesleyan. Further, the testimony of the workmen who removed the tree was that the tree appeared to be dead or rotten, had bark falling off, and had no green needles.

(b) The pines in the general area where the tree fell were blighted and many were dead, diseased, dying, or had fallen, so that a drive-by inspection would reveal to a reasonable landowner that this was a problem area. A problem area would give notice to the reasonable owner that an individual inspection of each tree was necessary in the blighted area. While the rotten cavity was not observable from the road, it was large enough to be seen from the railroad side.

While "there is no duty to consistently and constantly check all pine trees for non-visible rot," as a reasonable landowner, the presence of blighted pine trees with "visible, apparent, and patent" decay among a stand of pine trees gives rise to a duty to inspect. *Wade v. Howard*, supra at 58; *Willis v. Maloof*, supra at 350; *Cornett v. Agee*, supra at 57. "[O]nly if [the landowner] knew or reasonably should have known the tree was diseased, decayed or otherwise constituted a dangerous condition," did the owner become liable. *Wade v. Howard*, supra at 58; *Willis v. Maloof*, supra at 350. Thus, the landowner has constructive notice of what a reasonable inspection would reveal as to individual trees within the blighted area. Therefore, a jury was free to conclude, as it did, that a reasonable inspection should reveal the rotten cavity in the tree that fell, which had been present for ten to fifteen years.

(c) Singleton testified that he gave Boughton notice of the blighted trees, if not the actual tree that fell, prior to February 7, 1995. Boughton denied such notice was given prior to that date as to the tree that fell. This created a factual dispute for jury resolution. Such evidence of the dead and leaning tree as well as other diseased trees put Wesleyan on notice of a hazardous condition on its property, requiring an inspection. Thus, what it "reasonably should have known" from such inspection was not only that many trees in the general area were diseased, dead, or dying but that the specific tree that fell had a four-foot rotten cavity and was unhealthy, making it hazardous to the public because of its ninety-four-foot height and its proximity to the four-lane road. While the Singleton testimony may not have demonstrated actual notice as to the tree that fell, such testimony evidenced constructive notice as to that tree's condition. " '[N]otice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led.' " *Smalls v. Blueprint Dev.*, 230 Ga. App. 556, 558 (497 SE2d 54) (1998); *Real Estate Intl. v. Buggay*, 220 Ga. App. 449, 452 (2) (469 SE2d 242) (1996); *Delk v. Tom Peterson Realtors*, 220 Ga. App. 576, 577 (469 SE2d 741) (1996); see generally OCGA

§ 23-1-17. Wesleyan "is held to a standard of reasonable care in inspecting trees to ensure safety. [Cit.]" *Wade v. Howard*, supra at 58; see also *Cornett v. Agee*, supra at 55-56. "The jury was also authorized to find that this condition of the tree had existed for such a period of time that [Wesleyan] in the exercise of ordinary care should have discovered and removed this hazard to the users of the street." *City of Bainbridge v. Cox*, 83 Ga. App. 453, 457 (1) (64 SE2d 192) (1951); accord *City Council of Augusta v. Hammock*, 85 Ga. App. 554, 561 (4) (69 SE2d 834) (1952).

### Case No. A99A0459

Weber contends that the trial court abused its discretion in granting Wesleyan a new trial on the grounds of newly discovered evidence.

Ragnar William Johansen was not a factual witness prior to the occurrence and was not a factual expert witness as an actor or observer, either. See *Austin v. Kaufman*, 203 Ga. App. 704, 709 (7) (417 SE2d 660) (1992); *Jones v. Scarborough*, 194 Ga. App. 468, 470 (3) (390 SE2d 674) (1990); *Candler Gen. Hosp. v. Joiner*, 180 Ga. App. 455, 457-458 (2) (349 SE2d 756) (1986). Johansen was an expert retained by counsel for Weber in anticipation of litigation to assist in trial preparation and not to testify. OCGA § 9-11-26 (b) (4) (B). As such, Johansen came within the limited attorney work product/trial preparation exception of OCGA § 9-11-26 (b) (4) (B) and (C), which mandates two conditions that must be shown prior to allowing discovery of his knowledge and opinion: (1) exceptional circumstances and (2) manifest injustice would otherwise result. Neither of these conditions was met by Wesleyan as to Johansen prior to talking to him when it was known that he was Weber's former expert and that Weber did not want him to testify.[1]

---

[1] *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 308 (404 SE2d 607) (1991), held that the trial court could exclude testimony of an expert witness retained for trial preparation only for the movant, where the opposite party sought to compel his testimony at trial as their witness without first satisfying the OCGA § 9-11-26 (b) (4) (B) and (C) conditions of exceptional circumstances and that manifest injustice would otherwise result. Such exclusion of testimony was a proper sanction for discovery abuse. The facts of that case were similar to this case, where Wesleyan made no showing prior to talking to Johansen. *Jones v. Scarborough*, supra, dealt with a non-expert witness, a private investigator, being called to testify. The party for whom the investigator worked objected under OCGA § 9-11-26 (b) (4) (B), which the trial court ruled did not apply to a non-expert. In *Sherrill v. Martin*, 161 Ga. App. 558, 559-560 (2) (288 SE2d 648) (1982), one party's expert witness, a questioned document examiner, was called as a witness for deposition and the other side moved for protective order under OCGA § 9-11-26 (b) (4) (B) to prevent the testimony, because the condition for discovery had not been met. This Court held "that the requirements of [OCGA § 9-11-26] (b) (4) (B) did not apply and there was no necessity that appellee show exceptional circumstances to authorize the taking of the deposition" of a witness for use in evidence. Id. at 560 (2) (A). No

In his affidavit, Johansen testified that "I examined the tree and determined that it had been alive. The bark was intact. Green needle debris was still present in the area. The cut end of the tree disclosed no evidence of internal rot or damage. I did note a cavity, but in my opinion it played no role in the tree falling. It was also my opinion that the landowner, which was unknown to me at that time, could not have foreseen that this tree would fall." The inspection was made less than a week after the tree fell, which was close in time to Hartel's inspection. Thus, the expert witness' testimony merely noted: (1) what he observed as to the tree's condition, which was what the other experts testified to seeing; and (2) what his opinion was based on such observation, which was the same as the trial testimony of Wesleyan's expert Hartel.

Wesleyan amended its motion for new trial on the basis of what it alleged was newly discovered evidence.

> Mr. Johansen's information is material and would probably produce a directed verdict. Three foresters testified in this case, two of whom did not go to the scene until over a year following the fall of the tree. Dudley Hartel, who was called by the defendant, *was* at the scene a couple of weeks later, but was impeached by his testimony that he had only a "cursory" examination of the tree. Mr. Johansen, on the other hand, was there even sooner, and according to the information in his affidavit, conducted a thorough examination. This information would be extremely persuasive, and would likely produce a different result. For these reasons too, it is not cumulative, but is fresh evidence that should be considered by the jury. The purpose of Mr. Johansen's testimony is not to impeach any witness.

Since Wesleyan had an expert witness who had examined the tree within weeks of its fall, then it failed to establish exceptional circumstances or that Johansen's testimony was unique and not cumulative. OCGA § 5-5-23 provides:

> [a] new trial may be granted in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him

---

authority was cited for such proposition. Such case is distinguished on the same basis as *Jones v. Scarborough,* supra at 470. "The expert in *Sherrill* [*v. Martin,* supra at 559-560] was to be called as a witness at trial[;] therefore[,] the statutory showing of exceptional circumstances did not apply." *Heyde v. Xtraman, Inc.,* supra at 308.

and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.

Cumulative evidence is evidence tending to establish a fact in relation to which there was evidence at trial. *Baumbach v. Dickens*, 213 Ga. 745, 746-747 (1) (101 SE2d 702) (1958); *Distrib. Concepts Co. v. Hunt*, 221 Ga. App. 449, 451 (2) (471 SE2d 539) (1996). Johansen's testimony is cumulative of Wesleyan's other expert witness, Hartel, and even Weber's own experts as to what they observed, and Johansen's opinion is for the purpose of impeaching Weber's other expert witnesses' opinions.

Such proposed testimony will not make clear and positive that which previously was equivocal and uncertain, because the evidence is the same as produced at trial, even from Weber's experts. *Dougherty v. State*, 7 Ga. App. 91-92 (66 SE 276) (1909). Johansen's testimony is not "new and material facts" but constitutes expert opinions. Therefore, such opinion evidence fails to constitute newly discovered evidence within OCGA § 5-5-23. *Allen v. State*, 187 Ga. 178, hn. 1 (200 SE 109) (1938); *Battle v. State*, 73 Ga. App. 476, 480 (36 SE2d 873) (1946). Further, Johansen's testimony is not newly discovered evidence within the ambit of the statute. See *Timberlake v. State*, 246 Ga. 488 (271 SE2d 792) (1980); *Fields v. State*, 212 Ga. 652 (94 SE2d 694) (1956); *Aycock v. State*, 188 Ga. 550 (4 SE2d 221) (1939); *Lawrence v. State*, 227 Ga. App. 70, 73-74 (7) (487 SE2d 608) (1997); *Collins v. Kiah*, 218 Ga. App. 484, 485-486 (2) (462 SE2d 158) (1995).

Further, "[a]lleged newly discovered evidence is no cause for a new trial, unless it shall appear that the evidence itself is newly discovered, not merely that certain named witnesses by whom the facts can be proven were unknown until after the trial. [Cits.]" *Bass v. State*, 154 Ga. 112, 116-117 (113 SE 524) (1922); accord *Waters v. Narcarti*, 239 Ga. 545, 546 (3) (238 SE2d 83) (1977).

The sole purpose of tendering Johansen's testimony is that he derives his credibility from the rejection by Weber's counsel, and such testimony seeks to taint Weber's case by letting the jury know that he was Weber's expert who was not used because his opinion was favorable to Wesleyan and potentially harmful to Weber. Since Johansen's testimony failed to satisfy all six criteria of OCGA § 5-5-23, the trial court manifestly abused its discretion in granting a new trial on such grounds. See *Hegedus v. Hegedus*, 255 Ga. 44, 46 (2) (335 SE2d 284) (1985); *Aycock v. State*, supra at 550; *Cantrell v. Red Wing Rollerway*, 184 Ga. App. 506, 507-508 (1) (361 SE2d 720) (1987); *Exchange Bank of Oakfield v. Cone*, 18 Ga. App. 432 (89 SE 489) (1916). The grant of a new trial is reversed and vacated and the judgment reinstated.

*Judgment affirmed in Case No. A99A0419. Judgment reversed in*

*Case No. A99A0459. Johnson, C. J., Pope, P. J., Barnes, J., and Senior Appellate Judge Harold R. Banke concur. Blackburn, P. J., and Smith, J., dissent.*

SMITH, Judge, dissenting.

I respectfully dissent. While I agree fully with the affirmance of the trial court's denial of Wesleyan's motion for directed verdict and j.n.o.v. in the first appeal, Case No. A99A0419, I believe the trial court's grant of a new trial in Case No. A99A0459 should also be affirmed.

There is a well-established rule of deference to the trial court's decision in a grant or denial of new trial. The trial court heard all the evidence and observed the witnesses, and in ruling on a motion for new trial based on newly discovered evidence "[that] determination is entitled to great consideration." *Humphrey v. State*, 252 Ga. 525, 529 (3) (314 SE2d 436) (1984).

> In determining whether any newly discovered evidence would probably produce a different verdict, a trial court should not consider new evidence in isolation. Rather, it should consider the strength and weaknesses of both the state's and the defendant's case and the nature and strength of a defendant's new evidence.

(Citation omitted.) *Carl v. State*, 234 Ga. App. 61, 62 (1) (506 SE2d 207) (1998). "Furthermore, a motion for new trial based upon alleged newly discovered evidence is addressed to the sound discretion of the trial judge, and the reviewing court will not reverse his judgment overruling the motion, except where there is a manifest abuse of discretion." (Citations omitted.) *Aycock v. State*, 188 Ga. 550, 565-566 (4 SE2d 221) (1939). *Cantrell v. Red Wing Rollerway*, 184 Ga. App. 506 (361 SE2d 720) (1987), appears to require a finding as a matter of law that the trial court's finding was without evidentiary support, clearly erroneous, and an abuse of discretion. Finally, "[o]n the hearing of a motion for a new trial based on newly discovered evidence the trial judge becomes the trier of the facts. A reviewing court will not in such a case control his discretion as to the credibility of the witnesses." (Citations and punctuation omitted.) *Young v. State*, 194 Ga. App. 335, 336 (1) (a) (390 SE2d 305) (1990).

In virtually every case cited by the majority, the appeals courts followed this well-established rule and affirmed the trial court's decision on a motion for new trial. The sole exception cited by the majority to this pattern of deference to the trial court's discretion is *Hegedus v. Hegedus*, 255 Ga. 44, 46 (2) (335 SE2d 284) (1985), in which the Supreme Court reversed the trial court's *denial* of a new trial

because the wife in a divorce case concealed the fact of her remarriage when alimony, child support, and property distribution were in dispute. In *Distrib. Concepts Co. v. Hunt*, 221 Ga. App. 449, 451 (2) (471 SE2d 539) (1996), we held merely that the superior court did not have the authority under the law to remand a workers' compensation case to an administrative law judge on the ground of newly discovered evidence. In *Dougherty v. State*, 7 Ga. App. 91 (66 SE 276) (1909), this court reversed an order denying a motion for new trial, but one judge dissented and one concurred dubitante. While the latter decision has been cited recently by the Supreme Court of Georgia, it was cited in support of the proposition that "'evidence which removes all doubt upon a material point which was before doubtful is not in a legal sense cumulative.' [Cit.]" *Brown v. State*, 264 Ga. 803, 806 (3) (450 SE2d 821) (1994). That holding is particularly apt in the case of this newly discovered witness, Johansen.

Reviewing the standard established in *Timberlake v. State*, 246 Ga. 488, 491 (271 SE2d 792) (1980), it does not appear that the trial court manifestly abused its discretion in granting a new trial on the basis of the proffered testimony of Johansen. While the trial court's order granting the motion for new trial is quite brief, the trial court in an earlier letter to all counsel placed on the record its concerns regarding this witness's testimony. It is apparent that the trial court considered the elements of the *Timberlake* test and reviewed the new evidence in the context of other evidence presented at trial, as required by *Carl v. State*, supra.

There was ample evidence from which the trial court could have concluded that the purpose of Johansen's testimony was not to show his status as a plaintiff's expert, or to taint Weber's case. The testimony presented supports the conclusion that those facts were presented to explain the delay in discovery of the witness and Wesleyan's due diligence. See *Wade v. Howard*, 232 Ga. App. 55, 56-57 (499 SE2d 652) (1998).

Moreover, substantial evidence was presented that Johansen was a discoverable fact witness. He did not merely give an opinion as an expert based on the observations of others, nor did he simply act in a consultative capacity so as to not be subject to discovery. He was the first forester on the scene, at his estimation within a "couple of weeks"; the debris was still fresh and would have yellowed if as much as three weeks had passed. He also testified that he had examined the tree "quite thoroughly," while the expert who testified for Wesleyan acknowledged at trial that he had made only a "cursory" examination of the tree. The experts testifying on behalf of Weber at trial examined the tree over a year after the incident. The testimony of Johansen therefore established facts which he had a unique opportunity to observe; he was not merely an opinion witness. This court

should not appear to encourage in any way the withholding of factual testimony in discovery. See *Wade*, supra at 60.

On these facts, the trial court clearly had an ample basis for deciding that Johansen had a unique opportunity to observe the tree shortly after its fall and that his testimony as to what he observed was material to the case and not merely cumulative or impeaching. As the trial court specifically observed, Johansen testified in detail to factual observations which contradicted the factual support for the theory proposed by plaintiff to explain what was wrong with the tree and the reasons for its fall. This countervailing explanation of the condition leading to the deterioration and ultimate collapse of the tree, if believed by the jury, could well have produced a different verdict. Johansen's testimony was unique, formed the basis for a different theory of causation, and did not impeach another witness.[2]

In short, the trial court heard all the evidence presented at trial and had the benefit of hearing Johansen's testimony in person. On a motion for new trial based on newly discovered evidence, the trial court is the trier of fact and judges the credibility of the witnesses. The trial court here was in the best position to judge the relative value and importance of Johansen's evidence and its potential effect on the verdict. Wesleyan has presented evidence supporting each element of the *Timberlake* test, and I do not believe the trial court manifestly abused its discretion in granting a new trial.

For these reasons, I respectfully dissent.

I am authorized to state that Presiding Judge Blackburn joins in this dissent.

DECIDED MAY 13, 1999 — CERT. APPLIED FOR.

*Chambless, Higdon & Carson, Mary M. Katz, King & Spalding, Frank C. Jones, John P. Brumbaugh*, for appellant.

---

[2] "A witness may be impeached: a. By disproving the facts to which the witness testifies; b. By proof of contradictory statements previously made by the witness about matters relevant to the testimony and to the case; c. By evidence as to the witness's general bad character; or d. By the conviction of the witness for an offense involving moral turpitude." Suggested Pattern Jury Instructions, Vol. I: Civil Cases, prepared by the Council of Superior Court Judges, p. 16 (3rd ed. 1995); see also OCGA §§ 24-9-82 through 24-9-84. The latter three methods of impeachment are clearly irrelevant; as to the first, Johansen's testimony did not disprove any *facts* testified to by another witness, although the *opinion* he gave differed from that of plaintiff's experts, who did not observe or testify to the same facts at the same time.

*Reynolds & McArthur, W. Carl Reynolds, Katherine L. McArthur, Charles M. Cork III*, for appellees.

