315 Ga. 287
FINAL COPY

S22A1051.  SMITH v. THE STATE.

PETERSON, Presiding Justice.

Nineteen years ago, Danyel Smith was convicted of the murder of his infant son based on a theory of "shaken baby syndrome" ("SBS"). Smith now argues that the science regarding diagnosis of brain injuries in infants has changed so much since his trial that he is entitled to a new trial based on a new expert affidavit ruling out battery or shaking as the cause of the baby's death. The trial court rejected that argument and denied Smith's extraordinary motion for new trial without a hearing. Because Smith's extraordinary motion alleged facts that, if proven, may warrant relief, the trial court was not authorized to deny the motion without a hearing. We therefore vacate the trial court's ruling on the motion and remand for further proceedings.

1. *Background*

(a) *Trial, conviction, and appeal*

Smith was convicted of felony murder and aggravated battery in connection with the death of his infant son. This Court affirmed his convictions in 2008. See *Smith v. State*, 283 Ga. 237 (657 SE2d 523) (2008). In that decision, in the light most favorable to the verdicts, we summarized the evidence presented at Smith's November 2003 trial as follows:

> [O]n April 29, 2002, two-month-old Chandler was taken by his parents, Marsha Collins and Smith, to his pediatrician for a checkup. Following the checkup, Chandler was declared to be in good health. Chandler was then released from the doctor's office and into his parents' care. On the way home, the family stopped at a QuikTrip gas station. That afternoon, Collins left Chandler with Smith while she attended an appointment to apply for WIC public assistance. While Collins was at her appointment, she called Smith and told him to bring the baby to the WIC office. While Smith was en route to Collins' location with Chandler, Collins called him again, and Smith told Collins that Chandler was not breathing. Smith arrived at the WIC office with Chandler, who was limp and cold and had blood running from his nose. Collins called 911, and emergency responders rushed Chandler to the emergency room. At the emergency room, Chandler's heartbeat was restored, but he remained comatose, unresponsive, and unable to breathe on his own. A CT scan of Chandler's brain revealed a skull fracture, a hematoma, and swelling of the brain. Based on

the CT scan as well as Chandler's broken wrists, retinal hemorrhages, and the quick onset of his symptoms, Chandler was diagnosed as a "shaken baby," who had been subjected to vigorous shaking that was probably coupled with impact. Smith was the only person with Chandler during and immediately prior to the onset of his symptoms. The nature of Chandler's injuries did not indicate that they were self-inflicted, and the injuries were inconsistent with a simple fall or accidental trauma. After seven days in the hospital without any evidence of brain function, Chandler was removed from life support and died on May 6, 2002. A physical examination of Chandler's body after his death revealed abdominal bruising that was consistent with the spacing of adult knuckles.

Id. at 237-238 (1).

Dr. Anne Frankel, the pediatrician who saw Chandler for a check-up hours before he became nonresponsive, testified at trial that there were complications during Chandler's mother's pregnancy and that Chandler was born prematurely via Caesarean section ("C-section"). She testified that Chandler could not have had a life-threatening brain injury when she saw him on April 29, 2002. Dr. William Boydston, a pediatric neurosurgeon who treated Chandler after he arrived at the hospital, testified that he had concluded that Chandler had experienced a brain injury due to

3

shaking, based on Chandler's retinal subdural hematomas, blood clots of various ages, skull fracture, abdominal bruising, wrist fractures, and lack of a documented history of physical trauma or other medical history to explain his injuries. The State also presented the testimony of Dr. Steven Dunton, who both examined Chandler at the hospital in his role as a forensic pediatrician for the hospital and performed Chandler's autopsy as the county medical examiner. At trial, Dr. Dunton testified that Chandler died by homicide as a result of blunt-force head trauma. He acknowledged that some of the things he observed in Chandler could be explained by something other than abuse. But Dr. Dunton ultimately made "a collection of findings . . . that are classic and in some cases virtually exclusive for violent shaking."

There was evidence presented at trial that, several weeks before Chandler became unresponsive, his mother had summoned emergency medical assistance for Chandler due to a concern about breathing problems or a seizure. Dr. Boydston testified that the medical history of Chandler that was provided to him did not

4

reference seizures, but knowing Chandler had such a history would not change his conclusion. Dr. Dunton acknowledged on cross-examination that, prior to completing his autopsy report, he was not made aware of the prior request for emergency medical assistance for Chandler due to a possible seizure.

In his trial testimony, Smith was adamant that he did not shake, punch, beat, or kick Chandler, and that Chandler never experienced a fall in his presence. Smith's trial counsel emphasized in his closing argument that Chandler's mother also had access to the baby on the day he became nonresponsive and raised questions about her credibility. He did not challenge the expert medical testimony directly, although he noted Dr. Dunton's testimony that he had been unaware of the prior call for medical care due to a possible seizure, argued that Dr. Dunton had a conflict of interest given his two roles in the matter, and suggested that unskillful CPR performed on Chandler may have caused the baby's various injuries.

Smith was convicted of felony murder (predicated on first-degree cruelty to children) and aggravated battery, and moved for a

new trial. He raised several claims of ineffective assistance of counsel, including that trial counsel had failed to investigate competently the medical evidence prior to trial — relying on an inadequate review by the defense expert — and failed to present additional medical evidence at trial. Smith argued that a "competent expert" would have concluded that Chandler suffered a head injury shortly before a seizure that he experienced in March 2002 — when Collins and other people besides Smith had access to the child. Smith also suggested that vaccinations may have been a cause of Chandler's death, given that he was born prematurely and was predisposed to seizures. At the 2007 hearing on the motion for new trial, Smith presented the expert testimony of a forensic pathologist who opined that Chandler's skull fracture was the result of a birth injury or an injury that occurred after he was discharged from the hospital after birth but before paramedics were summoned to his home due to a possible seizure. This injury led to another, fatal seizure on April 29, 2002, he said. The pathologist testified at the motion-for-new-trial hearing that the SBS theory was "very

controversial," saying that "there are a number of [academic] papers denying its existence."

The trial court denied the motion for new trial. In our 2008 opinion affirming Smith's convictions, we said that evidence supported the conclusion that counsel made a reasonable decision not to pursue additional medical investigations after consulting with his expert, who believed that Chandler's injuries were consistent with physical abuse that occurred on the day alleged by the State. See *Smith*, 283 Ga. at 238-239 (2) (a).

(b) *Extraordinary motion for new trial*

In March 2021, Smith filed an extraordinary motion for new trial. Relying on an expert affidavit, various academic journal articles, and position papers by the American Academy of Pediatrics ("AAP"), the motion described a major shift in how the medical community thinks about infant head trauma, from generally presuming child abuse when an infant presents with head injuries, to instead requiring a full examination of the child's medical record, including the circumstances of the child's birth. As the motion

framed the issue, a hypothesis was "well-entrenched in the medical and legal communities" at the time of Smith's trial that violent shaking was presumptively to blame when an infant presented with "the triad" of subdural hemorrhage, retinal hemorrhages, and cerebral edema, with long falls (as from a multi-story building) and car crashes the only other possible explanations for the combination of those three symptoms. Smith cited a 2001 AAP position paper, which stated that "[t]he constellation of" injuries associated with SBS "does not occur with short falls, seizures, or as a consequence of vaccination." Amer. Acad. of Pediatrics, Comm. on Child Abuse and Neglect, Shaken Baby Syndrome: Rotational Cranial Injuries — Technical Report, 108 Pediatrics 206 (2001).

Smith's extraordinary motion said that a major shift in the medical community's thinking began in 2006 when the National Association of Medical Examiners withdrew a position paper endorsing the "triad" as diagnostic of SBS. The medical community increasingly began to accept the idea that the "triad" of symptoms once considered diagnostic of SBS may also be caused by birth

injuries, short falls, or other diseases, the motion posited. The motion cited a 2009 position paper by the AAP indicating that "[m]edical diseases" can "mimic" the presentation of abusive head trauma ("AHT"), a broader term that includes head injury due to shaking. See Amer. Acad. of Pediatrics, Comm. on Child Abuse and Neglect, Abusive Head Trauma in Infants and Children, 123 Pediatrics 1409 (2009).

Smith emphasized a 2018 position paper by the AAP and other professional organizations ("2018 Consensus Statement"). See A.K. Choudhary et al., Consensus Statement on Abusive Head Trauma in Infants and Young Children, 48 Pediatric Radiology 1048 (2018). The 2018 Consensus Statement, which framed itself as "intended to help courts improve the scientific accuracy of their decisions," decried "denialism of child abuse" and contentions by defense attorneys and their expert witnesses proffering "speculative causation theories" — including birth-related injuries — as alternative diagnoses in child abuse cases. The statement called the notion of a "triad" of symptoms as diagnostic of AHT a "straw man"

"fallacy" that is "a legal argument and not a medically valid term." Smith framed the 2018 Consensus Statement as "mandat[ing]" for the first time "that pediatricians presented with patients whose diagnosis previously would have defaulted to AHT must now thoroughly investigate the possibility of alternative causes." Smith claimed that the 2018 Consensus Statement represented the AAP's first recognition of birth trauma as an "alternative diagnosis" for the sort of symptoms presented by Chandler. Citing a 2020 journal article and his expert's affidavit, Smith also posited that "[t]oday it is known that vaccinations, including Hepatitis B, can cause seizures and encephalopathy even in healthy infants" and that "the modern medical literature recognizes that prematurity and other health conditions must be accounted for in vaccine administration."

The expert affidavit attached to Smith's motion was provided by the chair of neurosurgery at Mount Sinai West and Mount Sinai Morningside, Dr. Saadi Ghatan, opining that the cause of Chandler's death was pre-existing conditions resulting from birth injury and other events, and not from SBS. In his affidavit, Dr. Ghatan cited

10

several ways in which the medical understanding of infant head injuries has changed since the time of Smith's trial. Regarding Chandler's death in particular, Dr. Ghatan explained how various events — including acute fetal distress prior to Chandler's birth, prolonged labor by his mother, premature delivery via C-section and vacuum extraction, and prior seizures — led to a brain injury that was exacerbated by two things that happened shortly before Chandler became nonresponsive and stopped breathing: a seven-hour car ride the night before (that would have left a young infant dehydrated) and vaccinations received the same day.[1] Dr. Ghatan also explained how the medical evidence, in the light of current medical understanding, ruled out conclusions that Chandler's death was a result of battery or shaking: Chandler did not present with the sort of injuries that one would expect to see in a "battered" or

---

[1] In explaining how routine infant vaccinations could have been so problematic for Chandler, Dr. Ghatan noted Chandler's low birth weight of four pounds, seven ounces, and that "he received more vaccinations than customary, and at an accelerated pace"; the extraordinary motion averred that Chandler had accidentally been given two doses of the Hepatitis B vaccine during his initial neonatal hospitalization, such that the shot he received on April 29, 2002, was an "overdose."

11

"shaken" baby. Dr. Ghatan also posited that Chandler's abdominal bruising was caused by CPR performed on him by untrained persons. Dr. Ghatan added that he did not intend to suggest that the doctors who "handled" Chandler's case did anything improper under the standard of care at the time, but were working with a now-outdated framework.

Without holding an evidentiary hearing, the trial court denied the extraordinary motion for new trial.[2] Smith filed a discretionary application, which we granted. The case was orally argued before this Court on October 4, 2022.

2. *Analysis*

In denying Smith's extraordinary motion, the trial court concluded that the sort of expert opinion he offered could never constitute newly discovered evidence requiring a new trial. The court also concluded that Smith had failed to satisfy two of the requirements for obtaining a new trial based on newly discovered

---

[2] The trial court initially dismissed the motion, but then entered a new order denying it.

evidence. Because we conclude that the trial court was wrong to deny the motion on these bases without first affording Smith an evidentiary hearing, we vacate the trial court's order and remand for further proceedings.

"All motions for new trial, except in extraordinary cases, shall be made within 30 days of the entry of the judgment on the verdict[.]" OCGA § 5-5-40 (a). "When a motion for a new trial is made after the expiration of a 30 day period from the entry of judgment, some good reason must be shown why the motion was not made during such period, which reason shall be judged by the court." OCGA § 5-5-41 (a). Under some circumstances, newly discovered evidence may authorize the grant of an extraordinary motion for new trial:

> A new trial may be granted in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.

OCGA § 5-5-23; see also *Mitchum v. State*, 306 Ga. 878, 880-882 (1)

(a) (834 SE2d 65) (2019).

As we framed the requirements in *Timberlake v. State*, 246 Ga.

488 (271 SE2d 792) (1980):

> It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.

Id. at 491 (1) (citation and punctuation omitted). "Failure to show

one requirement is sufficient to deny a motion for a new trial." *State*

*v. Gates*, 308 Ga. 238, 250 (3) (840 SE2d 437) (2020) (citation and

punctuation omitted). "Extraordinary motions for new trial are not

favored, and a stricter rule is applied to an extraordinary motion for

. . . new trial based on the ground of newly available evidence than

to an ordinary motion on that ground." Id. (citation and punctuation

omitted). But "[w]here a defendant pleads [facts sufficient to

14

authorize that the motion be granted if the facts developed at the hearing warrant such relief] in his extraordinary motion and submits supporting affidavits, a trial court errs by ruling on the motion without first holding an evidentiary hearing." *Stinchcomb v. State*, 308 Ga. 870, 875 (2) (843 SE2d 847) (2020). "Whether a defendant has pleaded sufficient facts to entitle him to a hearing is a question of law that we review de novo." Id.

Before the trial court, the State contested Smith's extraordinary motion on only two of the *Timberlake* requirements, arguing that Smith had not shown that the motion was in fact based on evidence that had come to his knowledge since trial or that he had acted with due diligence. In its March 2022 order denying Smith's extraordinary motion for new trial, the trial court found that Smith had failed to meet his burden as to at least those two requirements. As to the first requirement, the court found that the sort of evidence offered as new — a different expert interpretation of the medical records that were used at trial — categorically did not meet the definition of newly discovered evidence. Moreover, the trial

15

court determined, the substance of the expert opinion on which Smith relies — in particular, "expert opinion to challenge the scientific basis of shaken baby diagnosis" — "has been available since the 1990s and was available at the time of the Defendant's trial[,]" and so was not "newly discovered." The trial court concluded that, for similar reasons, Smith also had failed to satisfy the second *Timberlake* requirement because he had not shown that he could not have obtained through due diligence a medical expert to challenge at trial the medical conclusions of the State's experts.

We begin our analysis by explaining why the trial court was not correct to conclude that the *sort* of evidence at issue here cannot qualify as newly discovered evidence.

(a) *The trial court erred by categorically rejecting Smith's evidence as a basis for a new trial on the ground that it was opinion evidence, without holding a hearing.*

In reaching his conclusion that Smith could not satisfy the first *Timberlake* requirement, the trial court concluded that the sort of expert opinion evidence offered could never qualify as newly-discovered evidence:

16

In this case, the Defendant has not shown newly discovered evidence at all. Instead, he offers a different interpretation of the medical records used at trial through a new expert witness. In his *Affidavit*, Dr. Ghatan relies exclusively on the same medical records that were always available to the Defendant at trial. . . . Expert opinion does not constitute "new and material facts" but merely "opinion evidence [which] fails to constitute newly discovered evidence." *Wesleyan [College] v. Weber*, 238 Ga. App. 90, 97 [(517 SE2d 813)] (1999).

The trial court erred.

The text of the relevant statute does not exclude expert opinion evidence from the sort of evidence that may provide the basis for an extraordinary motion for new trial. OCGA § 5-5-23 provides that the new evidence supporting such a motion may include "any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts," that is discovered by the applicant after trial and presented to the court with the requisite diligence. Of course, expert opinion testimony is "evidence." See, e.g., OCGA § 24-7-701 (b) ("Direct testimony as to market value is in the nature of opinion *evidence*." (emphasis supplied)); OCGA § 24-7-702 (f) ("It is the intent of the legislature that, in all proceedings, the courts of the State of Georgia not be viewed as open to expert

17

*evidence* that would not be admissible in other states." (emphasis supplied)); OCGA § 24-7-703 ("If [particular facts or data are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data *need not be admissible in evidence in order for the opinion or inference to be admitted*." (emphasis supplied)). It may be that expert opinion evidence does not fall within the term "facts," but the text of OCGA § 5-5-23 does not provide that the evidence in question must itself be "new and material facts." It requires only that the evidence must be "*relating* to new and material facts." (Emphasis supplied.) Expert opinion testimony may, indeed, relate to new and material facts.

The case law relied on by the trial court here does not demand a conclusion that expert opinion testimony can never support an extraordinary motion for new trial, either. Although the Court of Appeals opinion in *Wesleyan College*, cited by the trial court, included language suggesting that such evidence could not constitute new evidence under OCGA § 5-5-23 because it was expert

18

testimony, the opinion also described the proposed testimony as "cumulative" and "impeaching," 238 Ga. App. at 96-97 — aspects of the evidence that, under *Timberlake*, likely would have doomed it as a basis for a motion for new trial. Moreover, there was no suggestion in *Wesleyan College* that the evidence — an opinion by the plaintiff's former expert that the landowner-defendant could not have foreseen that a particular tree would have fallen — was based on new scientific developments or other *facts* that had become known to the defendant after trial. See 238 Ga. App. at 95-96.[3] The decision of this Court on which *Wesleyan College* relied also involved evidence that was merely impeaching, and, with little description of the evidence at issue, the opinion of this Court in that case contains no indication that the evidence was related to any new facts. See *Allen v. State*, 187 Ga. 178, 180 (1) (200 SE 109) (1938) ("Aside from the fact that

---

[3] Indeed, the expert who offered the "new" opinion inspected the tree *prior* to trial. See *Wesleyan College*, 238 Ga. App. at 96. The dissent insisted that because the expert in question examined the tree well before the experts who testified for the plaintiff at trial, that expert's testimony "established facts which he had a unique opportunity to observe; he was not merely an opinion witness." Id. at 99 (Smith, J., dissenting).

19

[the evidence in question] is largely or entirely opinionative, newly discovered evidence that is merely impeaching in character affords no legal reason for the grant of a new trial.").

Other decisions of this Court rejecting expert opinion evidence as a basis for granting a motion for new trial also did so on the grounds that the evidence was merely impeaching, without indicating that those opinions were related to new facts. See *Ruger v. State*, 263 Ga. 548, 551 (2) (c) (436 SE2d 485) (1993) (affirming denial of motion for new trial based on expert opinion that method employed by State's expert in conducting experiment about bloodprints was "scientifically unsound"; new opinion "tendered to disprove the facts on which the [testimony of the State's expert] was founded"); *Wright v. State*, 184 Ga. 62, 71 (9) (190 SE 663) (1937) (rejecting expert affidavit challenging State's testimony about substance found on pipes near defendant's workplace as basis for new trial, as it was "impeaching").[4] Rejecting a motion purportedly

_____

[4] In *Rogers v. State*, 257 Ga. 590 (361 SE2d 814) (1987), relied on in *Ruger*, we concluded that the affidavit of a pathologist who challenged various

20

based on newly-discovered evidence on the ground that the expert opinion evidence at issue was "impeaching" — a problem that is at least potentially fatal under the *Timberlake* standard — is not the same as saying that expert opinion evidence can never support an extraordinary motion for new trial. Nothing in our case law categorically excludes expert opinion evidence from serving as the basis for an extraordinary motion for new trial premised on newly discovered evidence.

And the conclusion that new expert analysis of existing physical evidence may constitute new evidence justifying the grant of an extraordinary motion for new trial accords with a recent decision of this Court. In *State v. Gates*, we affirmed the grant of an extraordinary motion for new trial based on analysis of DNA evidence through the TrueAllele software, which was not available to the parties at the time of the trial in that case. See 308 Ga. at 264 (3) (b). We rejected various challenges by the State to the reliance

aspects of the State's expert testimony failed to satisfy the *Timberlake* standard, but we didn't say why. See id. at 591 (2) (a).

21

on this analysis as a basis for granting a new trial, including that the defendant showed insufficient diligence:

> The State first argues that Gates should have brought his extraordinary motion much earlier, given the prevalence of DNA evidence in criminal proceedings since at least the 1990s. . . . As the State implicitly concedes by that argument, however, the "newly discovered evidence" in this case is not simply the DNA found on the belt and tie, or even the GBI's initial inconclusive test results for them. Those items, that DNA, and those results, have little value to Gates' case because the GBI's human interpretation of the DNA results was inconclusive. It was instead the TrueAllele analysis of those results that yielded Gates newly discovered evidence on which he could stake a claim to a new trial. Because the record established that the TrueAllele software had the ability to provide probative analysis of complex and degraded DNA mixtures in a way that traditional human methods could not (and apparently, to this day, cannot), it was not necessary under *Timberlake* for Gates to have sought TrueAllele analysis of the DNA located on the belt and tie at any point prior to 2005 when TrueAllele was first used.

Id. at 257 (3) (a) (iii). We used the shorthand "TrueAllele analysis" in describing the evidence at issue, but the evidence ultimately came in the form of expert testimony by the creator of the TrueAllele software: namely, "that the TrueAllele software determined that Gates is excluded as a contributor to the DNA mixture on" the physical evidence at issue. Id. at 250 (3). Although our opinion in

22

*Gates* did not address specifically the question of whether expert opinion testimony was categorically in the realm of "new" evidence that supports an extraordinary motion for new trial — the parties and the Court appear to have assumed that it was — *Gates* is consistent with the notion that new expert analysis of existing physical evidence may constitute newly discovered evidence supporting a grant of an extraordinary motion for new trial.

The trial court thus erred by denying Smith's extraordinary motion on the basis that "[e]xpert opinion does not constitute 'new and material facts'" and "opinion evidence . . . fails to constitute newly discovered evidence[,]" without considering whether the expert opinion that is offered as the primary support for Smith's motion *relates* to new and material facts. We will leave that ultimate determination for the trial court to make in the first instance. But Smith certainly has offered a pleading sufficient to satisfy that standard for purposes of obtaining a hearing. On its face, Dr. Ghatan's opinion purports to be based on new and material facts. In particular, his affidavit makes a number of factual assertions about

23

the development of the medical understanding of infant head injuries since the time of Smith's trial:

- "Experience documented since 2002 shows that the obstetrician's hands, a knife, vacuum, and forceps used during any C-section can all cause trauma to a baby's head[.]"

- Although Chandler's medical team did not scan Chandler's head following his birth despite swelling to his head — "appropriately so in 2002" — "[w]ith the more recent application of ultrasound technology, where there is no radiation exposure, we routinely document a much higher frequency of skull fractures and traumatic brain injuries in infants due to birth and incidental traumas than was done so two decades ago."

- "Since the time of Chandler's death, significant experience has been accumulated regarding the risk of seizures with vaccinations, which would only exacerbate the susceptibility of the brain of an infant such as Chandler, to experience a seizure."

- "Retinal hemorrhages, which . . . were commonly assumed to be due to non-accidental trauma 20 years ago, today are known to be associated with myriad causes such as stroke, raised intracranial pressure, and the nervous system being starved of oxygen."

- In the two decades since Chandler's death, "our perspective on child abuse and intentional brain injury has evolved" such that in a case of non-accidental trauma one would expect to see injuries not observed in Chandler when he presented at the hospital nonresponsive.

24

- "In 2002, the neurodiagnostic literature was rife with the belief that chronic subdural hematomas and acute subdural blood, when seen on the same CT scan, were commonly associated with abuse. Twenty years later, we know that infants who undergo scanning in the first four months of life often have chronic subdural hematomas and other fluid collections related to birth trauma. Twenty years later, we also know that there can be components of acute blood within the chronic fluid that are not necessarily caused by non-accidental trauma, but by trivial bumps or other metabolic causes."

- "[T]he standard of care has changed dramatically in the last twenty years thanks to advances in science and technology. In 2002 and 2003, the standard of care was to diagnose the symptoms observed in Chandler as the result of abuse, absent specific diseases or a known, large-scale accident. Today, unlike in 2002-2003, the diagnostic procedures and attention to particular details in a child head trauma case is entirely different."

These pleadings at the very least allege facts that, if proved at the hearing, would be sufficient to warrant a conclusion that the opinion offered in support of the motion relates to new and material facts. See *Stinchcomb*, 308 Ga. at 875 (2). The trial court thus erred by denying the motion without a hearing on the basis that Dr. Ghatan's expert opinion was categorically excluded from the statutory definition of newly discovered evidence.

(b) *The trial court erred by denying the extraordinary motion without a hearing on the basis that Smith had failed to show that his*

25

*motion was based on evidence that has come to his knowledge since the trial.*

In addition to concluding that opinion evidence could *never* constitute newly discovered evidence, the trial court also denied Smith's motion on the ground that Smith could not obtain relief because he had failed to show that the particular evidence on which his motion was based has come to his knowledge since the trial. Smith argues on appeal that the trial court erred in making these findings without an evidentiary hearing. Here as well, we agree.

The trial court broadly concluded based on two articles that "[t]his type of expert opinion [offered by Dr. Ghatan] has been available since the 1990s," such that Smith had failed to show that his motion was based on evidence that has come to his knowledge since the time of trial. But, on its face, Dr. Ghatan's *particular* opinion could not have been offered at the time of trial, let alone in the 1990s. As detailed above, Dr. Ghatan's opinion as outlined in his affidavit purports to be based on developments that occurred *after* trial. Moreover, the extraordinary motion itself contains several statements of fact to the effect that the medical community's

26

approach to infant head trauma has changed since the time of Smith's trial. In particular, the motion states that, around the time of Smith's trial, medical schools taught that shaking was the primary or exclusive cause of the so-called "triad" of subdural hemorrhage, retinal hemorrhages, and cerebral edema — and the AAP also took the position that this "constellation" of symptoms gave rise to a presumption of abuse and did not occur with short falls, seizures, or as a consequence of vaccination. Now, the motion states, "the medical and pediatric communit[ies] agree that child abuse is no longer the presumptive diagnosis when an infant presents with head injuries. Instead, a thorough examination of the full medical record is necessary, as it may reveal one of numerous possible alternative and unintentional causes, including birth trauma." Many of these factual assertions in the motion and affidavit involve research, clinical observations, or organizational changes of position occurring *after* the time of trial. Assuming for the sake of our analysis the truth of these statements in the extraordinary motion and supporting affidavit, Smith could not

27

have discovered prior to trial the same factual and opinion evidence that he offers now.[5]

In addition to differences between Dr. Ghatan's actual expert opinion as expressed in his affidavit and a hypothetical "type of expert opinion" that might have been offered 19 years ago, Dr. Ghatan's opinion is offered against the backdrop of the post-trial scientific developments that he references. As pleaded, those developments may make Dr. Ghatan's actual opinion more credible than a hypothetical, similar opinion that might have been offered at the time of trial, in ways that are, in the parlance of the *Timberlake* requirements, "so material that [they] would probably produce a different verdict." 246 Ga. at 491 (1) (citation and punctuation omitted).[6]

---

[5] Some of us are skeptical that changes in position by professional or other organizations — as opposed to the scientific studies that may or may not underlie those positions — are themselves so material that they would probably produce a different verdict. But this appeal does not require us to decide that question.

[6] Moreover, to say that an expert willing to offer a similar opinion might have been *found* in the past is not to say that such an opinion would have been *admissible* at that time. Although neither party appears to have argued explicitly that Dr. Ghatan's testimony would have been inadmissible had it

been offered at the time of trial, Smith does argue that "it is only in the recent past that enough scientific research has been peer-reviewed and published to refute the shaken baby hypothesis as it was presented at the trial of this case" and that "[t]his established medicine did not previously exist" such that he "could not have presented it" at trial. The State implies that Dr. Ghatan's testimony might not be admissible even today. At any rate, we observe that if an expert opinion would not have been admissible at a particular time in the past, that expert opinion cannot be said to be "evidence" that could have been discovered by the defendant at that particular time. Cf. *Timberlake*, 246 Ga. at 491 (1) ("Implicit in [the] six requirements for [granting a new trial on the basis of newly discovered evidence] is that the newly discovered evidence must be admissible as evidence."). Until recently, the "opinions of experts on any question of science" were generally admissible in criminal cases. See former OCGA § 24-7-707 (2013); see also *Debelbot v. State*, 305 Ga. 534, 542 (2) (826 SE2d 129) (2019) (noting that many of the State's challenges to medical evidence proffered by the defendants may "be more properly characterized as challenges to the qualification of the witnesses as experts or to the persuasiveness of the experts' testimony in the light of conflicting testimony from the State's experts"). But trial courts still were empowered to exclude expert testimony based on a particular "procedure or technique" on the ground that it had not "reached a scientific stage of verifiable certainty[.]" *Harper v. State*, 249 Ga. 519, 525 (1) (292 SE2d 389) (1982); see also, e.g., *Riley v. State*, 278 Ga. 677, 683 (4) (604 SE2d 488) (2004) (trial court did not abuse discretion in refusing under *Harper* to allow expert testimony on "false[-]confession theory"). Under that approach, trial courts were cautioned against "simply calculating the consensus in the scientific community." *Harper*, 249 Ga. at 526 (1). The General Assembly recently has amended the Evidence Code, however, to extend to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See Ga. L. 2022, p. 201, § 1 (amending OCGA § 24-7-702). Under that standard, a trial court must evaluate the reliability of the expert's proffered testimony; proper considerations include "whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training." *HNTB Ga. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010).

29

Rather than assuming the truth of the statements found in Smith's extraordinary motion and supporting affidavit for purposes of arguing that the motion was properly denied without a hearing, however, the State insists on challenging the credibility of these statements. Citing various articles, the State argues that "the specific theory advanced here — that birth trauma could have been the cause of the victim's injuries rather than shaken baby syndrome — goes back nearly 30 years and was available in the 1990s, years before the Appellant's trial." The State also argues that Dr. Ghatan's affidavit "merely offers the same type of expert opinions and theories — thoroughly discredited by the 2018 AAP *Consensus Statement* — that would have been available before his 2003 trial." To the extent that the State challenges the credibility of the averments of Smith and his supporting expert that there in fact have been new developments in the scientific community's understanding of infant trauma, or that Dr. Ghatan's opinion is in fact based on those developments, the place for that is an evidentiary hearing. By not affording Smith a hearing in which he could show that he had

evidence about the cause of Chandler's death materially different from that which could have been discovered, introduced, and admitted at the time of his trial, the trial court erred. See *Stinchcomb*, 308 Ga. at 875 (2) (trial court errs by denying extraordinary motion for new trial without a hearing where a defendant pleads facts sufficient to authorize that the motion be granted if the facts developed at the hearing warrant such relief).

(c) *The trial court erred by denying the extraordinary motion on the pleadings on the basis that Smith had failed to show that he had exercised due diligence.*

For similar reasons, the denial of Smith's extraordinary motion on the due diligence prong without a hearing also was error. The trial court denied Smith's extraordinary motion on the alternative ground that he could not satisfy the due diligence requirement because he had failed to show that he could not have found an expert to challenge the State's expert at trial — again, saying that the "type of expert opinion" that Smith attempts to present now would have been available at the time of trial. But, again, assuming the truth of statements contained in the extraordinary motion and supporting

31

affidavit, Smith could not have discovered prior to trial the same factual and opinion evidence that he offers now. To the extent that the State challenges the credibility of the statements made in the extraordinary motion and supporting affidavit to the effect that scientific developments have in fact occurred subsequent to trial, and that Dr. Ghatan's opinion is in fact based on those developments, that presents a factual dispute calling for a hearing.

The State notes that "[t]he statutes which control extraordinary motions for new trial based on newly discovered evidence require a defendant to act without delay in bringing such a motion." *Llewellyn v. State*, 252 Ga. 426, 428 (2) (314 SE2d 227) (1984). The State argues that Smith has failed to show why he waited 18 years after his conviction and 13 years after his direct appeal to bring his "newly discovered evidence" to the court's attention. The State suggests that, taking Smith's extraordinary motion on its own terms, the scientific developments supporting that motion occurred well before a group of organizations issued the 2018 Consensus Statement. In particular, the State noted, the motion

cited developments in 2006, 2011, and 2012.

Although the State argued below that Smith could not "show that he exercised either pre-trial due diligence or subsequent due diligence[,]" the trial court appears to have limited its analysis of the due diligence prong to only whether Smith showed pre-trial due diligence. But even assuming that the issue of Smith's post-trial diligence is properly before us, we cannot say that Smith's pleadings as to his post-trial diligence were insufficient to require a hearing. Although the extraordinary motion indicates that a shift in the medical community's understanding of abusive head trauma in infants began in 2006, it also alleges developments after that date. In addition to the 2018 Consensus Statement, the motion cites a 2020 article about adverse events resulting from vaccination. It is true that Dr. Ghatan's affidavit does not make clear when exactly the developments that he references occurred. But Dr. Ghatan's affidavit repeatedly suggests that his analysis is based on fairly recent developments — repeatedly contrasting medical understanding of infant head injuries at the time of Chandler's

death with that of "today," "twenty years later." Moreover, as explained above, a defendant who brings an extraordinary motion for new trial based on new scientific developments cannot prevail unless those developments are "so material that [they] would probably produce a different verdict." *Timberlake*, 246 Ga. at 491 (1) (citation and punctuation omitted). And a convicted defendant may file only one extraordinary motion for new trial, see OCGA § 5-5-41 (b), so a prudent defendant predicating such a motion on scientific developments would wait until he is confident in the materiality of those developments. Although the State may have plenty of room to argue at a hearing that Smith did not act with sufficient diligence in bringing forth the evidence that is the basis for his motion, we cannot say as a matter of law that Smith's pleadings are insufficient to even obtain a hearing on that point. The trial court erred in denying the motion without a hearing on the ground that Smith had failed to show that he acted with due diligence. See *Stinchcomb*, 308 Ga. at 879 (2) (b) (concluding that trial court erred in denying extraordinary motion based on due diligence factor without a

34

hearing).[7]

3.    *Conclusion*

In sum, the trial court erred by denying Smith's extraordinary motion for new trial on the ground that it was based on opinion evidence that could never support such a motion. The trial court also erred by denying the motion, without a hearing, on the alternative bases that Smith had not shown that his motion was based on evidence that has come to his knowledge since the trial or that he had brought that evidence to the court's attention with due diligence. The State has not opposed Smith's bid for a hearing on

---

[7] In his briefing before this Court, Smith argues that we should grant him a new trial outright, because he satisfied the first two *Timberlake* requirements through his written submissions and the State did not contest the other requirements below, arguing only in the alternative that this Court should remand the case for an evidentiary hearing. But Smith cites no authority for mandating that his extraordinary motion be granted at this stage. Even if the State has waived its right to contest Smith's motion based on certain *Timberlake* requirements — an issue we need not resolve here — our conclusion that Smith has satisfied the *pleading* standard as to the *Timberlake* requirements the State contested below means only that he is entitled to a hearing, not that he is entitled to a new trial. To secure a new trial, Smith will still need to *prove* that these requirements have been met. See *Timberlake*, 246 Ga. at 491 (1) ("It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence *to satisfy the court*" as to the six requirements. (citation and punctuation omitted; emphasis supplied)).

other grounds. We therefore vacate the trial court's order denying the motion and remand for the trial court to consider the motion anew after affording Smith an evidentiary hearing.

*Judgment vacated and case remanded with direction. All the Justices concur.*

Decided December 20, 2022.

Motion for new trial. Gwinnett Superior Court. Before Judge Batchelor.

*Mark A. Loudon-Brown, Whitney K. Lee*, for appellant.

*Patsy Austin-Gatson, District Attorney, Christopher M. DeNeve, Brenda L. Romero, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.