308 Ga. 870
FINAL COPY

S20A0355. STINCHCOMB v. THE STATE.

McMILLIAN, Justice.

At a 2004 trial, a jury found Appellant Mario Stinchcomb guilty of felony murder and aggravated assault with a deadly weapon in connection with the shooting death of Jakesha Young. This Court affirmed Stinchcomb's convictions on direct appeal. See *Stinchcomb v. State*, 280 Ga. 170 (626 SE2d 88) (2006). In 2018, Stinchcomb filed an extraordinary motion for new trial based on newly discovered evidence, which the trial court denied without the benefit of an evidentiary hearing.[1] This Court thereafter granted Stinchcomb's application for discretionary appeal to consider whether the trial court erred by failing to hold an evidentiary hearing before ruling on his motion. For the reasons discussed below, we conclude that the trial court did err, and, accordingly, we vacate its order denying

---

[1] The judge who ruled on Stinchcomb's extraordinary motion for new trial was not the judge who presided over his trial.

Stinchcomb's motion and remand this case for an evidentiary hearing.

1. We begin with a review of the evidence presented at Stinchcomb's trial. On November 6, 2002, police officers responded to a person-injured call in Fulton County and, upon arriving at the scene, found Young's body on the side of the road. Based upon information received from a confidential informant, law enforcement arrested Stinchcomb and his co-defendant Michael Woolfolk the following day. Woolfolk was arrested after initially fleeing from police; during the chase, he removed a gun from his pocket and aimed it at the pursuing officer before dropping the weapon. The weapon was later recovered and identified as a nine-millimeter Ruger pistol; police also recovered an Intertech .45-caliber pistol from Woolfolk's father's home, where Woolfolk had hidden the gun. Stinchcomb and Woolfolk were indicted on charges of malice murder, felony murder predicated on aggravated assault with a deadly weapon, and aggravated assault with a deadly weapon; Woolfolk was also indicted for aggravated assault of a police

officer.

At the co-defendants' joint trial, State's witness Randy Harris testified to the series of events leading to Young's death. According to Harris, during the early morning hours of November 6, he, Stinchcomb, Woolfolk, and Max Stevens were hanging out in the second-floor apartment in which Harris lived. Young worked as a prostitute and was invited over by Stinchcomb. When Young arrived, she and Stinchcomb retired to the apartment's sole bedroom; both exited the bedroom about three minutes later, arguing over the value of her services. Stinchcomb, Harris, and Young all began walking toward the apartment's front door, but upon reaching the door, Young insulted Stinchcomb, who responded by "smack[ing]" her. An incensed Young exclaimed, "I'm going to get my sh*t,"[2] then ran down the stairs to a waiting car, which was parked directly beneath the apartment's window, and retrieved a gun. Harris and Stinchcomb were watching from the second-floor

---

[2] Harris testified that he understood this to mean that Young was going to get a gun.

porch outside Harris' apartment, and Young pointed the gun up toward the porch and shot at Harris and Stinchcomb.[3] After Young fired her weapon, Stinchcomb ran to the apartment bedroom to get his own gun. Young, meanwhile, was walking back to the car, and by the time she got to the car, Stinchcomb and Woolfolk were shooting out the apartment window. Harris testified that Young "made it to the car. That's when [Stinchcomb and Woolfolk] started shooting . . . and I saw her get in the car and close the door and the guy that was driving just [spun] off."

On cross-examination, Harris clarified that Young's pimp was waiting for her in the car and that the pimp handed Young the gun. Harris agreed that he did not know at whom or at what Young was aiming, only that she aimed in his direction and that she was standing directly beneath the apartment window when she shot. Harris also testified that, after Young's first shot, he turned to go

---

[3] According to Harris, Young "pointed the gun at our direction. . . . It was slightly over our head and she shot." He further clarified that he "couldn't tell exactly whether the bullet went over the roof or not but I know, I mean, when she shot, she was aiming at us and evidently the bullet had to go over the roof because it didn't hit anything."

back inside the apartment and heard more shots but could not see who was shooting and did not see the entire series of events. When he entered the living area of the apartment, he saw Stinchcomb and Woolfolk crouched down and shooting out the window. Harris then returned to the front door and looked out to see Young get into the passenger side of the waiting car before it drove off. Harris could not recall exactly how many shots were fired or who was firing at any given time but testified that, after Young got into the car, no more shots were fired.

The medical examiner who performed Young's autopsy concluded that Young died from a bullet wound to the head. A nine-millimeter bullet was recovered from Young's skull, and testing confirmed that the bullet was fired from the Ruger nine-millimeter pistol that belonged to Woolfolk.

The lead detective on the case testified that he recovered from beneath Harris' apartment window three .45-caliber cartridge cases and a nine-millimeter cartridge case; testing later confirmed that two of the .45-caliber cartridge cases and the nine-millimeter

cartridge case were fired from the guns belonging to Woolfolk. The detective also testified that, during the course of his investigation, he had occasion to interview Jamario Ford, who drove Young to Harris' apartment on the night of the crimes. The detective testified that he was contacted by Ford about a week after Young's body was found and that he interviewed Ford the same day. Ford brought his vehicle to the police station and allowed the detective to inspect it. The detective testified that he found a hole in the roof of the vehicle that appeared to be consistent with a gunshot. Swabbings of what appeared to be blood were taken from the vehicle, and forensics identified Young's DNA on the swabbings.

Woolfolk testified in his own defense at trial. According to Woolfolk, as Young was leaving the apartment, she told Stinchcomb, "I'm fixin' to go get my sh*t, and I'm going to kill you." Woolfolk, who was sitting on a sofa inside the apartment, got up and looked out the window to see Young return to Ford's car and retrieve a gun. Young fired her first shot while standing in front of the car door on the vehicle's passenger side, while Woolfolk observed from the

apartment window. When asked in which direction Young was aiming, Woolfolk responded that it "looked like she was — that the gun was in my direction." Woolfolk testified that Young then fired her weapon a second time (he did not specify from where Young shot), so he ducked down below the window sill, stuck his weapon — the nine-millimeter pistol — through a broken window pane, and blindly fired his weapon once before it jammed. Woolfolk then lay flat on the floor. According to Woolfolk, Stinchcomb did not come into the room and begin shooting until after Woolfolk had lain on the floor.

On cross-examination, the State repeatedly confronted Woolfolk about his initial statement to police in which Woolfolk claimed he never fired his weapon because it jammed; Woolfolk admitted this statement was untrue. On rebuttal, the State recalled the lead detective who testified that Woolfolk, after admitting that his initial statement was untrue, told the detective that he did, in fact, fire his weapon at Young. According to the detective, Woolfolk

omitted any mention of Young's firing her weapon two times.[4]

Ultimately, the jury acquitted Stinchcomb and Woolfolk of malice murder but found both men guilty of felony murder and aggravated assault. On his direct appeal to this Court in 2006, Stinchcomb argued, in part, that "his conviction was unwarranted because he was justified in shooting Young." *Stinchcomb*, 280 Ga. at 172 (1). We rejected that argument, explaining that, "[a]t the time that she was fatally shot, however, Young was already in her car attempting to leave the scene. Therefore, by the time Woolfolk and Stinchcomb began shooting, there was no longer an imminent threat to them justifying the use of deadly force[.]" Id. In August 2018, Stinchcomb filed an extraordinary motion for new trial based on newly discovered evidence that, he argues, would provide support for his justification defense and warrants the grant of a new trial. The trial court disagreed, however, and denied his motion without a hearing, a ruling from which Stinchcomb sought and was granted a

---

[4] Though the detective testified that Woolfolk's statement was video-recorded, it does not appear that the recording was played for the jury, nor is the recording part of the record before us.

discretionary appeal.

2. Turning to the sole issue on appeal — whether the trial court should have held an evidentiary hearing before denying Stinchcomb's extraordinary motion for new trial — we start by recognizing that "[t]he Georgia Code draws a distinction between timely, or ordinary, motions for new trial and untimely, or extraordinary, motions for new trial." *Ford Motor Co. v. Conley*, 294 Ga. 530, 539 (2) (757 SE2d 20) (2014). Extraordinary motions for new trial, as this Court has long recognized, are not favored "because they work to undermine the finality of judgments and the reliance that litigants are normally entitled to place on final decisions rendered in our courts." Id. Though extraordinary motions for new trial are authorized by statute, the statute offers little guidance, beyond requiring a "good reason" for the delay, regarding the specific requirements that must be met for such motions to be granted. See OCGA § 5-5-41 (a)-(b).[5] The requirements governing such motions

---

[5] OCGA § 5-5-41 provides, in pertinent part, as follows:
(a) When a motion for a new trial is made after the expiration

are therefore "the product of case law." *Drane v. State*, 291 Ga. 298,

300 (2) (728 SE2d 679) (2012) (citation and punctuation omitted). In

considering extraordinary motions for new trial based on newly

discovered evidence in criminal cases, trial courts conduct their

analysis within the now-familiar six-factor framework set forth by

this Court in *Timberlake v. State*, 246 Ga. 488 (271 SE2d 792) (1980),

where we explained:

> It is incumbent on a party who asks for a new trial on the
> ground of newly discovered evidence to satisfy the court:
> (1) that the evidence has come to his knowledge since the
> trial; (2) that it was not owing to the want of due diligence
> that he did not acquire it sooner; (3) that it is so material
> that it would probably produce a different verdict; (4) that
> it is not cumulative only; (5) that the affidavit of the
> witness himself should be procured or its absence
> accounted for; and (6) that a new trial will not be granted
> if the only effect of the evidence will be to impeach the
> credit of a witness.

of a 30 day period from the entry of judgment, some good reason
must be shown why the motion was not made during such period,
which reason shall be judged by the court . . . .

(b) Whenever a motion for a new trial has been made within
the 30 day period in any criminal case and overruled or when a
motion for a new trial has not been made during such period, no
motion for a new trial from the same verdict or judgment shall be
made or received unless the same is an extraordinary motion or
case; and only one such extraordinary motion shall be made or
allowed.

Id. at 491 (1) (citations and punctuation omitted). See also *Dick v. State*, 248 Ga. 898, 899-900 (2) (287 SE2d 11) (1982) (applying *Timberlake* factors to *extraordinary* motion for new trial based on newly discovered evidence). If the party seeking a new trial fails to satisfy even one of the *Timberlake* requirements, the trial court is authorized to deny his motion. See *Timberlake*, 246 Ga. at 491 (1).

Because of its disfavored nature, "a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground." *Dick*, 248 Ga. at 899 (1) (citation and punctuation omitted). "Thus, although we have held that . . . the trial court is required to hold a hearing on a motion for new trial, we have also held that an extraordinary motion for new trial which fails to show any merit may be denied without the necessity of a hearing." Id. (citations omitted). A trial court does not err in denying an extraordinary motion for new trial in a criminal case without a hearing "if the pleadings . . . do not contain a statement of *facts* sufficient to authorize that the motion be granted if the facts developed at the

hearing warrant such relief." Id. at 899 (2) (emphasis in original). In addition, to obtain a hearing, a defendant must "provide sworn affidavit testimony, or an explanation for the absence of such affidavit testimony, showing with clarity and specificity the facts he or she intends to prove in a hearing and how those proffered facts support his or her claim that a new trial is warranted." *Davis v. State*, 283 Ga. 438, 448 (5) (660 SE2d 354) (2008). Where a defendant pleads such facts in his extraordinary motion and submits supporting affidavits, a trial court errs by ruling on the motion without first holding an evidentiary hearing. Whether a defendant has pleaded sufficient facts to entitle him to a hearing is a question of law that we review de novo. See generally *Ford Motor Co.*, 294 Ga. at 538 (2) n.7 (explaining that "pure questions of law" in a motion for new trial are reviewed de novo). With this framework in mind, we consider whether the trial court erred here by denying Stinchcomb's extraordinary motion for new trial without an evidentiary hearing.

In support of his motion, Stinchcomb pleaded facts and

proffered a single affidavit executed on March 2, 2018, by Jamario Ford, the driver of the vehicle in which Young was killed. The affidavit, while largely consistent with the evidence presented at trial, offered several facts that lend significant support to Stinchcomb's claim of self-defense. Importantly, Ford's affidavit indicates that he was the sole witness to have an unobstructed and uninterrupted view of the events leading to Young's death: Ford averred that he pulled his car into the alleyway alongside Harris' apartment building, with the driver's side of the vehicle facing the building. Consistent with Harris' and Woolfolk's testimony, Ford witnessed Young arguing with someone on the upstairs porch outside Harris' apartment and heard the person repeatedly ask Young to leave. The person then appeared to push Young, who returned to Ford's vehicle, retrieved a firearm from her purse, leaned over the top of the car, and shot once in the direction of the upstairs porch. When Ford told Young that he was leaving, she got in the car. According to Ford, Young then leaned out the window and over the car and fired her weapon at the person on the porch a second

time. As Ford sped away, he heard a gunshot and noticed that Young had been hit. Ford further explained that, though he was contacted by a detective about the incident, the detective told Ford that he "would not be needed"; moreover, no defense attorney ever contacted Ford for a statement.

By contrast, the record shows that before trial as part of the discovery process, the State provided Stinchcomb with a police report summarizing Ford's interview with the detective.[6] According to the summary, Ford reported that when Young returned to his vehicle, she "removed a revolver from her cosmetic purse and he physically pulled her into the vehicle. . . . [W]ithout warning he heard gunfire coming from the building and he sped out of the parking area." Upon realizing that Young was unresponsive, bleeding, and apparently lifeless, Ford "became scared," so he removed Young's body from the vehicle, left the area, and later

---

[6] Though Ford's interview was purportedly video-recorded, the video-recording is not part of the record. The State indicated at the hearing on Stinchcomb's extraordinary motion for new trial that Stinchcomb's trial counsel "had a recording of [Ford's] statement prior to trial."

discarded her revolver in a College Park dumpster.[7]

In denying Stinchcomb's motion, the trial court rested its decision primarily on the first two *Timberlake* factors, finding that Ford was known to the parties at the time of trial and, relatedly, that Stinchcomb failed to show due diligence in trying to obtain Ford's testimony. The trial court also ruled on the materiality of Ford's statement, finding in a footnote that the statement was cumulative because "[t]here was testimony that the victim fired a shot in the direction of the defendants before attempting to leave the scene." Having reviewed both Stinchcomb's extraordinary motion for new trial and the trial record, we conclude that the trial court erred by denying Stinchcomb's motion on these grounds without first holding an evidentiary hearing. See *Davis*, 283 Ga. at 448 (5).

(a) In regard to the first factor, the trial court reasoned that the evidence was not new because Ford was known to the parties at the time of trial, noting that Ford's unsworn statement to police was

---

[7] Ford was indicted on February 4, 2003, for concealing Young's death, and a copy of his indictment was provided to the defense.

provided to Stinchcomb during discovery more than twelve months before trial and that Stinchcomb had successfully objected to the admission of Ford's pre-trial statement to police. The State maintains on appeal that the trial court's finding was correct, emphasizing that Stinchcomb was aware of Ford's existence for more than a year before trial. This reasoning is flawed.

When considering the first *Timberlake* requirement — that the evidence has come to Stinchcomb's knowledge since trial — the inquiry is focused on the evidence itself. See *Wright v. State*, 34 Ga. 110, 114 (1) (1864) ("It is the *discovery of unknown* evidence, and not the *ascertainment* of the materiality of *known* evidence, which can serve as a cause for a new trial. . . . [I]t must be made to appear, that either the fact itself, proposed to be proven, or the evidence by which it may be proven, was unknown to the accused at the time of the trial." (citation and punctuation omitted; emphasis in original)). Evidence is, of course, "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." Black's Law Dictionary (11th ed. 2019).

While it is true, as the trial court and the State observed, that Ford was known to the parties at the time of trial, Ford as a witness is not the evidence at issue — the content of his sworn affidavit is.

Unlike his pre-trial statement, Ford's affidavit acknowledges that Young fired her weapon, that she fired it twice in the direction of the person standing on the upstairs porch, and that she fired the second shot either shortly before or as Ford's car sped off, immediately before being struck by Woolfolk's return fire. According to his motion, Stinchcomb was unaware that Ford possessed knowledge of and would testify to these critical facts. Thus, the trial court erred in determining that the pleadings failed to support the first *Timberlake* factor. Cf. *State v. Hill*, 295 Ga. 716, 720 (763 SE2d 675) (2014) (witness' sworn affidavit providing alibi for appellant did not come to appellant's knowledge since trial because appellant would have been aware of witness' knowledge that appellant was with her).

(b) The trial court also found that Stinchcomb failed to satisfy the second *Timberlake* requirement of showing that it was not owing

to want of due diligence that he did not acquire the new evidence sooner. In his motion, Stinchcomb asserted that he did not acquire Ford's testimony sooner because the State informed the defense before trial that Ford could not be found, because Stinchcomb "had no idea where Ford was or that Ford was willing to testify," and because "[a]s far as Stinchcomb knew no one could find [Ford] until now." Stinchcomb further stated that Ford came forward "on his own to advise of his location and willingness to testify."[8] In rejecting Stinchcomb's argument, the trial court again relied heavily on the fact that Stinchcomb knew of Ford's existence for at least 12 months before trial, impliedly assuming that Ford was therefore available and could have been found before trial through reasonable efforts.

Given the lack of an evidentiary hearing on these issues, evidence pertaining to Stinchcomb's due diligence is scant. However,

---

[8] Ford's affidavit is somewhat at odds with these assertions. Ford stated that he is "presently in federal custody and [has] been contacted by Mario Stinchcomb's attorney requesting information related to my presence at the scene of the crime for which Mr. Stinchcomb and Mr. Woolfolk were charged and convicted." And Ford's affidavit is dated six months before Stinchcomb's motion was filed.

the trial record offers some support for Stinchcomb's claim that Ford could not be located by the State and that searching for him before trial would have been in vain. During his opening statement, the prosecutor referred to Ford and appeared to be moving toward a discussion of Ford's statement to police; Woolfolk objected, noting that "the State has informed the defense that they could not find Mr. Ford and they will not have him here." The prosecutor indicated that he would not be discussing Ford's statement, so the trial court did not rule on Woolfolk's objection. Later, while cross-examining the lead detective who testified on direct about inspecting Ford's vehicle, the defense attempted to show that the State could not locate Ford because he had absconded after being indicted for concealing Young's death.[9] The detective testified that he had "no idea" where Ford was and had no information regarding his location; he further explained that he discussed Ford's whereabouts with the prosecutor

---

[9] Ford was indicted on February 4, 2003, the same day that Stinchcomb and Woolfolk were indicted. A copy of Ford's indictment was provided to the defense as part of discovery on April 2, 2003; however, no information about Ford beyond his sex, race, and birthdate was provided to the defense.

before trial and understood from those discussions that Ford had not been found. On re-direct, when asked by the prosecutor whether he understood Ford to be dead, the detective confirmed that to be his understanding.

Ordinarily, an affirmative showing of pre-trial due diligence is necessary to satisfy the *Timberlake* standard, but in this case, there is evidence in the record to support the conclusion that Stinchcomb reasonably relied upon the State's affirmative representation that it was unable to locate Ford and that Ford was unavailable and indeed dead. This was a representation that Stinchcomb and his trial counsel were permitted to credit, which could conceivably account for Stinchcomb's own failure to search more aggressively for Ford prior to trial. See *State v. Gates*, 308 Ga. 238, 258 (3) (a) (iii) (840 SE2d 437) (2020). Indeed, if Stinchcomb's delay in locating Ford was effected by the State's representations, that delay "cannot be counted against [him]." Id.

This is not the end of our inquiry, however. Stinchcomb must also demonstrate that he has exercised due diligence *since* his trial.

He must account both for the 14-year delay in obtaining the new evidence and for the six-month delay between securing Ford's sworn affidavit and presenting his motion to the trial court. See, e.g., *Drane*, 291 Ga. at 304 (3) (b) (discussing lack of diligence after trial). Whether Stinchcomb can satisfy the due-diligence requirement with respect to these time periods is a close question because his motion and Ford's supporting affidavit are lacking in facts pertaining to this issue, but it is clear from the trial record that the detective, as elicited by the prosecutor, testified that he understood that Ford was dead. Again, Stinchcomb was permitted to rely on that representation, which could explain why Stinchcomb did not immediately attempt to look for Ford after trial. See *Gates*, 308 Ga. at 258 (3) (a) (iii).

However, as the State notes, Ford's affidavit omits any mention of *when* he was first contacted by Stinchcomb's attorney. And Ford's affidavit, when considered in conjunction with Stinchcomb's motion, raises the question of *how* this new evidence came to Stinchcomb's attention. Though Stinchcomb claims that

Ford came forward of his own volition, Ford's affidavit seems to indicate the opposite — that Stinchcomb's attorney reached out to Ford. Nevertheless, Stinchcomb has pleaded sufficient facts to entitle him to an evidentiary hearing where these questions of fact can be further explored. Thus, we conclude that the trial court erred by denying Stinchcomb's extraordinary motion based on the due-diligence factor before holding a hearing.

(c) Having concluded that Stinchcomb's motion contained a statement of facts that, if proved, would satisfy the first two *Timberlake* requirements, we turn to a consideration of the remaining requirements because, unless Stinchcomb pleaded facts sufficient to satisfy all six *Timberlake* factors, the trial court did not reach the wrong result. For the reasons discussed below, we conclude that Stinchcomb pleaded facts and presented a supporting affidavit that, if proved, would satisfy the remaining *Timberlake* requirements and that the trial court was thus required to hold an

evidentiary hearing before ruling on the motion.[10]

As an initial matter, Stinchcomb has clearly satisfied the fifth *Timberlake* requirement of procuring the witness' affidavit — Stinchcomb attached Ford's sworn affidavit to his extraordinary motion for new trial. Cf. *Davis*, 283 Ga. at 443 (3) (A) (unsworn statement submitted to support a motion for new trial based on newly discovered evidence must be disregarded). As to the requirements that this evidence be material, not cumulative, and not merely impeaching,

> we do not ignore the testimony presented at trial, and in fact, we favor that original testimony over the new. However, we must also attempt to account for how the new evidence would have influenced the jury's assessment of the evidence presented by the State [at Stinchcomb's] trial, had such evidence been available to [Stinchcomb] at that time. In so doing, we must consider the strength and weaknesses of both the State's and the defendant's case and the nature and strength of the defendant's new evidence.

*Gates*, 308 Ga. at 259 (3) (b) (citations and punctuation omitted).

---

[10] We express no opinion as to the merit of Stinchcomb's extraordinary motion for new trial. Our consideration here is limited to the narrow issue of whether the extraordinary motion contained a statement of facts sufficient to obtain a hearing on his motion.

Our review of the record shows that the evidence presented at Stinchcomb's trial was largely undisputed. There was no question that both Woolfolk and Stinchcomb fired their weapons or that Woolfolk fired the shot that killed Young. In regard to Stinchcomb, the only real question before the jury was whether he acted in self-defense, and the evidence presented on that point was rather close.

Harris, the State's primary witness and the State's only witness to the shooting, offered inconsistent testimony as to the timing of Woolfolk's return fire. On direct examination, Harris testified that, after Young fired her weapon, he turned around and went back inside the apartment, where he saw Stinchcomb and Woolfolk shooting out the window from crouched positions. Harris then returned to the front door to see that Young "was walking to the car. By the time she got to the car, [Stinchcomb] was shooting out the window." He also testified that Young "made it to the car. That's when they started shooting." But on cross-examination, Harris testified that the shooting was over by the time he saw Young get in the car and close the door, which is unlikely given evidence that Young was shot while

inside the car. Harris was not sure how many bullets were fired and, by his own admission, did not see the entire series of events. Notwithstanding his inconsistent testimony on cross-examination, Harris' testimony was the linchpin in the State's theory of the case, which posited that Woolfolk and Stinchcomb were seeking revenge when they fired their weapons at Young. Indeed, the State argued in closing that:

> Before [Young] got in that car, the uncontradicted testimony is that she turned her back and walked toward it, you understand. What I'm saying to you is[,] as Randy Harris told you, and Mr. Woolfolk said he could not see, for this woman to get in her car, she turned her back. The threat is over. She walked to the car. They are getting ready to shoot, if they kill her at this point it's revenge not self defense.

But Ford's testimony would cast significant doubt on this theory while providing strong support for Woolfolk and Stinchcomb's justification defense. Ford's testimony shows not only that Young fired two shots in Stinchcomb and Woolfolk's direction, but that she fired the second shot from the car, either shortly before the car sped off or as it was speeding off. This testimony is consistent with and

lends credence to Woolfolk's testimony that Young shot twice in what appeared to be his and Stinchcomb's direction and that Woolfolk did not fire his weapon until after Young's second shot. Moreover, Ford's testimony, taken with Harris' testimony, tends to show that only a matter of seconds passed between Young's second shot and Woolfolk's return fire that killed her — a showing that cannot be made without the benefit of Ford's testimony.

Finally, Ford's testimony serves a purpose beyond merely impeaching the credibility of a witness at trial. Although Ford's testimony is in part incongruous with Harris' trial testimony, Ford's testimony adds to and fills gaps in Harris' testimony, providing a more complete account of the events leading to Young's death. Cf. *State v. Abernathy*, 295 Ga. 816, 818 (1) (764 SE2d 387) (2014) (newly discovered evidence that State's witness "said one thing to his attorney but then told a different story to police and at trial goes strictly to [the witness'] credibility" and thus served only to impeach the witness' trial testimony).

Thus, we conclude that key portions of Ford's affidavit, if

deemed credible,[11] appear to be non-cumulative of the evidence presented at trial, to serve a purpose beyond impeaching the credibility of a witness, and to be so material as to probably produce a different verdict, thus satisfying the remaining *Timberlake* requirements. Accordingly, the trial court erred by denying Stinchcomb's motion without the benefit of a hearing, and we therefore vacate the judgment of the trial court and remand this case for an evidentiary hearing on Stinchcomb's extraordinary motion for new trial.

*Judgment vacated and case remanded. All the Justices concur.*

DECIDED JUNE 1, 2020.
Murder. Fulton Superior Court. Before Judge Millender.
*Law Firm of Shein & Brandenburg, Marcia G. Shein, Leigh S. Schrope*, for appellant.
*Paul L. Howard, Jr., District Attorney, Stephany J. Luttrell, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.

---

[11] "[I]f testimony is not credible, it is not so material that it would probably produce a different verdict." *Jackson v. State*, 304 Ga. 827, 832 (3) (822 SE2d 198) (2018).