NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 15, 2025

S25A0548.  SMITH v. THE STATE.

BETHEL, Justice.

In 2003, Danyel Smith was convicted of felony murder and aggravated battery in connection with the death of his two-month-old son, Chandler, based on a diagnosis of Shaken Baby Syndrome ("SBS"). On direct appeal, we affirmed Smith's convictions. See *Smith v. State*, 283 Ga. 237 (2008) ("*Smith I*"). In 2021, Smith filed an extraordinary motion for new trial based on newly discovered evidence, arguing that the science surrounding the diagnosis of brain injuries in infants has dramatically evolved since his trial and pointing to a new expert affidavit ruling out SBS as the cause of Chandler's death. See *Smith v. State*, 315 Ga. 287, 287 (2022) ("*Smith II*"). The trial court denied Smith's motion without conducting an evidentiary hearing. Id. Smith appealed, and we

vacated the trial court's ruling based on our conclusion that the facts alleged in Smith's motion, "if proven, may warrant relief" and, as such, "the trial court was not authorized to deny the motion without a hearing." Id. On remand, the trial court conducted an evidentiary hearing at which Smith presented the testimony of eight expert witnesses over the course of six days. The trial court again denied Smith's motion, and we granted Smith's application for discretionary appeal to consider whether the trial court applied the appropriate legal framework for deciding an extraordinary motion for new trial like Smith's that is based on new expert analysis of existing physical evidence. For the reasons explained below, we conclude that the trial court's analysis failed to conform to the requisite legal framework, and we agree with Smith that the trial court's order must be vacated and this case remanded for that court to apply the appropriate framework.

1. *Background*

We detailed the particulars of Smith's extraordinary motion for new trial in *Smith II*:

2

Relying on an expert affidavit, various academic journal articles, and position papers by the American Academy of Pediatrics ("AAP"), the motion described a major shift in how the medical community thinks about infant head trauma, from generally presuming child abuse when an infant presents with head injuries, to instead requiring a full examination of the child's medical record, including the circumstances of the child's birth. As the motion framed the issue, a hypothesis was "well-entrenched in the medical and legal communities" at the time of Smith's trial that violent shaking was presumptively to blame when an infant presented with "the triad" of subdural hemorrhage, retinal hemorrhages, and cerebral edema, with long falls (as from a multi-story building) and car crashes the only other possible explanations for the combination of those three symptoms. Smith cited a 2001 AAP position paper, which stated that "the constellation of" injuries associated with SBS "does not occur with short falls, seizures, or as a consequence of vaccination."

Smith's extraordinary motion said that a major shift in the medical community's thinking began in 2006 when the National Association of Medical Examiners withdrew a position paper endorsing the "triad" as diagnostic of SBS. The medical community increasingly began to accept the idea that the "triad" of symptoms once considered diagnostic of SBS may also be caused by birth injuries, short falls, or other diseases, the motion posited. The motion cited a 2009 position paper by the AAP indicating that "medical diseases" can "mimic" the presentation of abusive head trauma ("AHT"), a broader term that includes head injury due to shaking.

Smith emphasized a 2018 position paper by the AAP and other professional organizations ("2018 Consensus Statement"). The 2018 Consensus Statement, which

3

framed itself as "intended to help courts improve the scientific accuracy of their decisions," decried "denialism of child abuse" and contentions by defense attorneys and their expert witnesses proffering "speculative causation theories" — including birth-related injuries — as alternative diagnoses in child abuse cases. The statement called the notion of a "triad" of symptoms as diagnostic of AHT a "straw man" "fallacy" that is "a legal argument and not a medically valid term." Smith framed the 2018 Consensus Statement as "mandating" for the first time "that pediatricians presented with patients whose diagnosis previously would have defaulted to AHT must now thoroughly investigate the possibility of alternative causes." Smith claimed that the 2018 Consensus Statement represented the AAP's first recognition of birth trauma as an "alternative diagnosis" for the sort of symptoms presented by Chandler. Citing a 2020 journal article and his expert's affidavit, Smith also posited that "today it is known that vaccinations, including Hepatitis B, can cause seizures and encephalopathy even in healthy infants" and that "the modern medical literature recognizes that prematurity and other health conditions must be accounted for in vaccine administration."

The expert affidavit attached to Smith's motion was provided by the chair of neurosurgery at Mount Sinai West and Mount Sinai Morningside, Dr. Saadi Ghatan, opining that the cause of Chandler's death was pre-existing conditions resulting from birth injury and other events, and not from SBS. In his affidavit, Dr. Ghatan cited several ways in which the medical understanding of infant head injuries has changed since the time of Smith's trial. Regarding Chandler's death in particular, Dr. Ghatan explained how various events — including acute fetal distress prior to Chandler's birth, prolonged labor by his mother, premature delivery via C-section and vacuum

4

extraction, and prior seizures — led to a brain injury that was exacerbated by two things that happened shortly before Chandler became nonresponsive and stopped breathing: a seven-hour car ride the night before (that would have left a young infant dehydrated) and vaccinations received the same day.[1] Dr. Ghatan also explained how the medical evidence, in the light of current medical understanding, ruled out conclusions that Chandler's death was a result of battery or shaking: Chandler did not present with the sort of injuries that one would expect to see in a "battered" or "shaken" baby. Dr. Ghatan also posited that Chandler's abdominal bruising was caused by CPR performed on him by untrained persons. Dr. Ghatan added that he did not intend to suggest that the doctors who "handled" Chandler's case did anything improper under the standard of care at the time, but were working with a now-outdated framework.

*Smith II*, 315 Ga. at 290–92 (cleaned up; footnote in original).

Eighteen months after we remanded this case in *Smith II*, the trial court held an evidentiary hearing on Smith's motion at which Smith presented the testimony of Dr. Ghatan and seven other expert witnesses. The State presented the testimony of two expert

---

[1] In explaining how routine infant vaccinations could have been so problematic for Chandler, Dr. Ghatan noted Chandler's low birth weight of four pounds, seven ounces, and that "he received more vaccinations than customary, and at an accelerated pace"; the extraordinary motion averred that Chandler had accidentally been given two doses of the Hepatitis B vaccine during his initial neonatal hospitalization, such that the shot he received on April 29, 2002, was an "overdose."

5

witnesses of its own in rebuttal. As a general matter, Smith's experts testified about changes in the medical understanding of three hallmark injuries underlying an SBS diagnosis — subdural hemorrhage, retinal hemorrhage, and diffuse axonal injury in the brain — and how that changed understanding would affect Chandler's diagnosis in this case. Smith's experts also testified regarding their analysis of Chandler's medical records and offered their opinions, informed by current medical understanding, as to the cause of those injuries. The State, through its witnesses, sought to demonstrate the inaccuracy of the conclusions reached by Smith's experts regarding Chandler's cause of death. Six months later, the trial court denied Smith's motion in a lengthy order that was drafted by the State and adopted without alteration by the trial court, finding that Smith failed to show that the new evidence was in fact newly discovered, that he exercised diligence in obtaining and presenting that evidence to the court, or that the evidence was material. Smith filed an application for discretionary review, which we granted. The case was orally argued before this Court on April

6

15, 2025.

2. *Analysis*

Georgia law "draws a distinction between timely, or ordinary, motions for new trial and untimely, or extraordinary, motions for new trial," the latter of which "have long been disfavored by the law because they work to undermine the finality of judgments[.]" *Ford Motor Co. v. Conley*, 294 Ga. 530, 539 (2014). See also OCGA § 5-5-41. Thus, we have cautioned that the grant of such a motion "should not be commonplace, but rather is warranted only in truly 'extraordinary' circumstances." Id. Still, it is well settled that "the discovery of new evidence that would be admissible at the defendant's criminal trial and that materially affects the question of the defendant's guilt or innocence is a proper subject of an extraordinary motion for new trial." *Mitchum v. State*, 306 Ga. 878, 880 (2019).

Of course, evidence intended to establish a previously unknown historical fact has long been recognized as a type of evidence that may justify the grant of an extraordinary motion for new trial. See,

7

e.g., *Wright v. State*, 34 Ga. 110, 114–15 (1864). More recently, this Court also has recognized that the type of evidence forming the basis for Smith's extraordinary motion — that is "new expert analysis of existing physical evidence" — "may constitute new evidence justifying the grant of an extraordinary motion for new trial." *Smith II*, 315 Ga. at 296; see also *State v. Gates*, 308 Ga. 238, 257 (2022). A party who asks for a new trial on the ground of newly discovered evidence bears the burden of showing that: (1) the new evidence was unknown to him at the time of trial; (2) the evidence could not have been acquired sooner through the exercise of due diligence; (3) the evidence is so material it would probably produce a different verdict; (4) the evidence is not merely cumulative; (5) the witness's affidavit has been obtained or its absence accounted for; and (6) the evidence serves a purpose beyond impeaching the credibility of a witness. See *Timberlake v. State*, 246 Ga. 488, 491 (1980).

When reviewing a trial court's ruling on an extraordinary motion for new trial based on new evidence, we "accord substantial deference" to the court's decision. *Ford Motor Co.*, 294 Ga. at 538.

We review the trial court's findings of fact for clear error, "meaning that we must uphold a finding if there is any evidence in the record to support it," and "we review the trial court's ultimate ruling … only for abuse of discretion." Id. See also OCGA § 5-5-41(a) (extraordinary motion requires "good reason" and said "reason shall be judged by the court"). Nevertheless, "that discretion is not unfettered." *Ford Motor Co.*, 294 Ga. at 538. Rather, a trial court must exercise its discretion "in conformity with the governing legal principles," and its decision must be based on "correct facts" that are "relevant to determining whether the legal requirements were satisfied." Id. (quotation marks omitted).

(a) *Admissibility*

"Implicit in [the] six requirements for [granting a new trial on the basis of newly discovered evidence] is that the newly discovered evidence must be admissible as evidence." *Timberlake*, 246 Ga. at 491. See also *Dick v. State*, 248 Ga. 898, 900–01 (1982) (affirming denial of extraordinary motion that failed to show facts satisfying "the overriding requirement that the newly discovered evidence be

admissible"). Here, in response to Smith's extraordinary motion for new trial in the court below, the State challenged the admissibility of the testimony of Smith's expert witnesses under OCGA § 24-7-702 ("Rule 702"), which would govern in the event of a retrial.[2] Rule 702 requires courts to evaluate the admissibility of expert testimony under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579 (1993), and its progeny. See OCGA § 24-7-702(f). And the State argued that portions of Smith's experts' testimony failed to meet the *Daubert* standard for reliability. See *Smith II*, 315 Ga. at 300 n.6 (Under *Daubert*, "a trial court must evaluate the reliability of the expert's proffered testimony; proper considerations include whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the

---

[2] At the time of Smith's first trial, the standard articulated in *Harper v. State*, 249 Ga. 519, 525 (1982), remained in force. Under *Harper*, trial courts "were empowered to exclude expert testimony based on a particular 'procedure or technique' on the ground that it had not 'reached a scientific stage of verifiable certainty.'" *Smith II*, 315 Ga. at 300 n.6 (quoting *Harper*, 249 Ga. at 525). But the *Harper* standard does not apply to hearings or trials commenced after July 1, 2022. See id.; Ga. L. 2022 at 201–02, § 3.

general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training." (quotation marks omitted)).

In its order denying Smith's motion, the trial court at the outset cited two appellate decisions relevant to the *Daubert* analysis, but in the lengthy analysis that follows, the trial court made no express ruling on the *Daubert* issue with respect to any of the testimony challenged by the State. The State nevertheless insists that the trial court determined that much of the testimony presented by Smith's experts failed to meet the *Daubert* standard for reliability and therefore excluded the testimony on that basis, asserting at oral argument that we should construe the order's bare references to the unreliability of certain testimony as findings that the evidence was inadmissible under *Daubert*.

But the order itself contradicts the State's assertion that the trial court found any of Smith's experts' testimony inadmissible under Rule 702 and *Daubert*. Specifically, the order states that, in ruling on Smith's motion, the trial court had "qualified several

11

experts" and "consider[ed] *everything* that was presented at the hearing[,] including the testimony and exhibits, and the arguments and briefing submitted by the parties." (Emphasis added.) Thus, the trial court necessarily, albeit implicitly, rejected the State's argument that certain testimony was inadmissible under Rule 702 and *Daubert*.[3] See *Hampton v. State*, 289 Ga. 621, 627 (2011) ("trial courts are presumed to consider only relevant, legal evidence"), overruled on other grounds by *Nalls v. State*, 304 Ga. 168 (2018). So we proceed to evaluate the trial court's rulings on the three *Timberlake* requirements at issue here.

(b) *Newly Discovered Evidence*

The first requirement for obtaining a new trial on the basis of newly discovered evidence is that the evidence must in fact be newly discovered, that is, it must have been unknown to the defendant at the time for filing a timely, ordinary motion for new trial. See *Timberlake*, 246 Ga. at 491; *Patterson v. State*, 228 Ga. 389, 390–91

---

[3] We express no opinion on the merits of the trial court's implicit ruling admitting this evidence. Because the State did not appeal this ruling, the issue is not before us.

(1971) ("[The] state of facts [forming the basis for an extraordinary motion for new trial based on new evidence] must have been unknown to the movant or his counsel at the time when an ordinary motion for a new trial could have been filed[.]" (quotation marks omitted)). This inquiry "is focused on the evidence itself," and the defendant must show "that either the fact itself, proposed to be proven, or the evidence by which it may be proven, was unknown to the accused at the time of the trial" and the time for filing a timely motion for new trial. *Stinchcomb v. State*, 308 Ga. 870, 877–78 (2020) (quotation marks omitted); see also *Patterson*, 228 Ga. at 390–91. And in *Smith II* we held that "new expert analysis of existing physical evidence" may "relate to new and material facts" and, thus, may constitute newly discovered evidence on which an extraordinary motion for new trial may be premised. *Smith II*, 315 Ga. at 295–96.

In determining that Smith failed to satisfy this requirement,[4]

---

[4] The trial court's order touches on this requirement only briefly, and the truncated analysis is embedded within findings that appear to be related to the materiality factor, described further below.

the trial court found that Smith's "presentation of evidence has failed to show by reliable scientific evidence that the diagnosis of abusive head trauma in infants has changed since 2002-2003 [in such a way] that would constitute newly discovered evidence under *Timberlake*." In support of this finding, the trial court reasoned that Smith "has not shown that the [State's] expert witnesses at [his] trial made a presumptive or materially flawed diagnosis" and thus had failed to "persuade[ ]" the trial court that his "conviction rests on an obsolete or unreliable foundation." The trial court indicated that its finding rested on "the reliable and credible testimony of [the State's expert witnesses], the record of the case, and numerous exhibits and the scientific papers and studies presented."

This analysis was wholly unsupported by decisional authority, and it is unclear to us how these findings or the evidence cited by the trial court are at all related to the *Timberlake* factor at issue. The fact that the witnesses at Smith's trial testified consistently with the then-current understanding of SBS has no bearing on whether the particular evidence supporting Smith's extraordinary

14

motion for new trial was unknown to Smith and his counsel at the time of trial. See *Stinchcomb*, 308 Ga. at 877 (trial court erred by finding that eyewitness testimony had not come to defendant's knowledge since trial on basis that witness was known to defendant before trial because the eyewitness "as a witness is not the evidence at issue — the content of his sworn affidavit is"). It is likewise unclear how the testimony of *the State's* expert witnesses has any bearing on *Smith's* knowledge at the time of trial. The question pertinent to this factor is whether the expert opinion testimony underlying his extraordinary motion for new trial was known to Smith or his counsel at the time of his 2003 trial. See id.; *Smith II*, 315 Ga. at 299 ("The trial court broadly concluded based on two articles that 'this type of expert opinion offered by Dr. Ghatan has been available since the 1990s,' such that Smith had failed to show that his motion was based on evidence that has come to his knowledge since the time of trial. But, on its face, Dr. Ghatan's *particular* opinion could not have been offered at the time of trial, let alone in the 1990s." (cleaned up)). By centering its analysis on

factual findings unrelated to the applicable legal inquiry, the trial court erred. See *Ford Motor Co.*, 294 Ga. at 538 ("[T]he trial court's discretion must be exercised in conformity with the governing legal principles, and the facts that the court must find and that we must evaluate on appeal are those relevant to determining whether the legal requirements were satisfied."). On remand, the trial court should conduct its analysis of this *Timberlake* factor consistently with this opinion and applicable decisional law.

(c) *Diligence*

The trial court also found that Smith failed to satisfy *Timberlake*'s due diligence requirement. The diligence requirement is related to, but distinct from, the new-knowledge requirement: besides showing that the newly discovered evidence was unknown to him, the defendant must also show that, even in the exercise of due diligence, he *could not* have acquired the evidence at issue. See *Dick*, 248 Ga. at 900. As we have explained, "[t]he grant of an extraordinary motion for new trial on the ground of newly discovered evidence is reserved for cases in which the facts at issue

in the motion were previously impossible to ascertain by the exercise of proper diligence." *Bharadia v. State*, 297 Ga. 567, 573 (2015). To satisfy the defendant's burden of proof on this requirement, the defendant must make a "factual showing that [the new] evidence could not have been discovered by the exercise of ordinary diligence" before trial or during the motion-for-new-trial stage. *Timberlake*, 246 Ga. at 491–92; *Bharadia*, 297 Ga. at 569–70, 573 ("[T]he record reflects no evidence showing that [the defendant] was unable to obtain this evidence prior to trial."). Besides diligence in discovering the evidence at issue, the defendant also must exercise diligence in bringing that evidence to the court's attention. That is, the record must show that, when the defendant became aware of the evidence forming the basis for his extraordinary motion, he acted diligently in presenting his motion and the new evidence to the court. See *Drane v. State*, 291 Ga. 298, 304 (2012).

The trial court here rested its finding of a lack of diligence on its determination that Smith could have presented testimony "generally critical" of SBS at the time of his trial because "the

hearing revealed a long history of litigation on [SBS] going back decades" and "there have been experts available for decades … who questioned the validity of [SBS]." The State echoes this rationale on appeal. But this narrow view of Smith's evidence is incorrect. The foundation of Smith's motion is not testimony that is "generally critical" or merely "question[s] the validity of" SBS. Rather, Smith's motion relies on the testimony of eight expert witnesses that, Smith says, offers a new analysis of Chandler's medical records rooted in a new understanding of the underlying science and a medically based alternative explanation for Chandler's injuries. The finding that Smith could have presented testimony "generally critical" of SBS in 2003 provides no basis for concluding that Smith lacked diligence in bringing forth the specific evidence at issue in this case because the diligence factor is concerned with the particular evidence forming the basis of the defendant's motion. See *Bharadia*, 297 Ga. at 571–72 (noting "inconsistent use of the term 'evidence'" in order denying extraordinary motion for new trial and identifying specific evidence at issue in motion before considering diligence); *Gates*, 308 Ga. at

18

257 (rejecting argument that, "given the prevalence of DNA evidence in criminal proceedings since at least the 1990s," defendant should have sought DNA testing on existing physical evidence sooner because the newly discovered evidence at issue was not simply the DNA found on the physical evidence but rather DNA analysis derived from new software).

The trial court's diligence analysis suffers from another infirmity — its nearly singular focus on identifying a precise date at which, in the court's estimation, Smith's new evidence could have been obtained and presented to the court. Of course, this type of analysis makes sense when the new evidence at issue is physical evidence or historical-fact-based evidence, such as testimony from a witness with knowledge relevant to the charged crimes, the materiality of which is readily apparent with the exercise of diligence and the acquisition of which is generally within the control of the defendant. See *Drane*, 291 Ga. at 304 ("[T]he diligence requirement ensures that cases are litigated when the evidence is more readily available to both the defendant and the State, which

19

fosters the truth-seeking process."). But the form and nature of the evidence matters to the diligence inquiry. Smith's evidence — the experts' testimony — is based not on historical fact or direct observation of an alleged crime but rather on their understanding of scientific knowledge. And the materiality of scientific development often becomes apparent only with the passage of time as new theories are subjected to the rigors of scientific testing, peer review, and the general scrutiny of the scientific community. Cf. *Daubert*, 509 US at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." (quotation marks omitted)); *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) ("Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized[.]"), superseded on other grounds as recognized in *Daubert*, 509 US at 586–87.

Recognizing this reality, we have observed that "a prudent defendant predicating [an extraordinary] motion on scientific developments would wait until he is confident in the materiality of those developments" before presenting the new evidence to the court. *Smith II*, 315 Ga. at 302. Indeed, endorsing the trial court's analysis would impose upon defendants the requirement of filing an extraordinary motion for new trial based on scientific developments at the moment the theory on which that motion is based has seeped into the intellectual ether without consideration of the base of scientific support for that theory. Simply put, the diligence requirement of *Timberlake* cannot operate to require a defendant to present evidence of new scientific developments to the court until the defendant is able to ascertain and prove the materiality of those developments, especially in light of the fact that "a convicted defendant may file only one extraordinary motion for new trial." See id. ("[A] defendant who brings an extraordinary motion for new trial based on new scientific developments cannot prevail unless those developments are 'so material that they would

21

probably produce a different verdict.'" (alteration adopted)); see also *Bharadia*, 297 Ga. at 570 ("Good reason exists only where the moving party exercised due diligence but, due to circumstances beyond his control, was unable previously to discover the basis for the claim he now asserts." (citations and punctuation omitted)).

Because the trial court relied on an incorrect characterization of the evidence forming the basis for Smith's motion and failed to apply the proper legal framework in its analysis of this *Timberlake* factor, the court erred. On remand, the trial court should undertake the diligence analysis with the delicate balance we discussed above in mind, while also taking care not to conflate its analysis of the diligence factor with its analysis of the newly discovered evidence factor.

(d) *Materiality*

Finally, we turn to the materiality requirement. To satisfy the *Timberlake* materiality requirement, a defendant must show that the evidence on which his extraordinary motion is based is "so material that it would probably produce a different verdict."

22

*Timberlake*, 246 Ga. at 491. As we recognized in *Smith II*, "expert opinion testimony *is* 'evidence'" that may properly form the basis for an extraordinary motion for new trial. *Smith II*, 315 Ga. at 295–96 (emphasis added). And expert opinion testimony that offers a new analysis of existing physical evidence premised on post-trial scientific developments can satisfy the *Timberlake* materiality standard. See id. at 300; *Gates*, 308 Ga. at 259–60.

Here, the bulk of the trial court's order on Smith's extraordinary motion appears to be dedicated to an assessment of the materiality factor. In considering this factor, the trial court's factual findings generally center on whether the opinion advanced by Smith's expert witnesses about the cause of Chandler's injuries was correct in the court's estimation or whether the State's rebuttal witnesses, who maintained that Chandler's injuries resulted from SBS, offered the more persuasive explanation. And without exception, the court found the State's experts more persuasive and rejected Smith's experts' opinions about the source of a particular injury. Then, in light of its rejection of Smith's experts' testimony,

the trial court summarily concluded that Smith failed to demonstrate *Timberlake* materiality or make some other showing articulated in the order.[5] This is not the appropriate framework within which to analyze *Timberlake* materiality.

As we have explained, in assessing materiality, the pertinent inquiry is not "whether the trial court found the newly discovered evidence persuasive in light of the other evidence presented at trial, but whether 'a reasonable juror' probably would." *Gates*, 308 Ga. at 259. Under that framework, a court must "attempt to account for how the new evidence would have influenced the jury's assessment

---

[5] Among the various phrasing in the trial court's order indicative of the standards that it applied are the following: "the Court is not persuaded that [Smith's] conviction rests on an obsolete or unreliable foundation"; "[t]he Court must determine whether [Smith] has shown that in light of current medical understanding, it is now understood that the victim did not present with injuries that would be expected for a 'battered' or 'shaken' baby as claimed by the affiant Dr. Ghatan"; "the Court evaluates whether the evidence, including the up-to-date medical journals, exhibits, and scientific papers submitted at the hearing show that the victim's injuries are today now understood to have been more likely the result of pre-existing trauma, such as birth trauma, or a seizure, triggered by various factors such as vaccination and dehydration"; "the Court finds that there is no increased or material certainty based on the evidence it received or any scientific developments since [Smith's] 2003 trial that the victim's birth, including his c-section, contributed to his death"; and "[Smith] has not shown that recent scientific studies materially undermine the foundations of the evidence used to convict him at trial."

of the evidence presented by the State" at the defendant's trial, had the new evidence been available to the defendant at that time. *Gates*, 308 Ga. at 259. See also *Fields v. State*, 212 Ga. 652, 653 (1956) (observing that "none of [the] requirements [for obtaining a new trial on newly discovered evidence] can be determined without an examination of the evidence adduced upon the original trial of the case"). The trial court's order here does not engage in the type of analysis contemplated by *Timberlake* and its progeny, as it contains no assessment of how Smith's new evidence would have factored into the jury's consideration of the evidence presented at his trial. Rather, the trial court's various findings on materiality all flow from the court's own assessment of the persuasiveness of the testimony offered by Smith's and the State's expert witnesses and its determinations as to which expert offered the better explanation for Chandler's injuries. This was erroneous. See *Gates*, 308 Ga. at 259.

The trial court's materiality assessment also overlooks a critical point about the type of evidence on which Smith's extraordinary motion is based. Specifically, Smith's motion is

predicated not on evidence intended to establish a historical fact, the veracity of which may be up for debate. Instead, his motion relies on expert opinion testimony, and an expert opinion that, as here, has been found relevant, reliable, and thus admissible under Rule 702 "is not fact that can be proved true or false. It is opinion."[6] *United States v. Shea,* 989 F3d 271, 278 (4th Cir. 2021). See also *Smith v. State,* 318 Ga. 868, 872–73 (2024) (distinguishing between expert opinions and factual assertions and noting that "[e]xpert opinions are just that — opinions — and are subject to different standards of reliability and trustworthiness that govern their admission"). We have acknowledged that in assessing whether a jury would find expert testimony persuasive under these circumstances, a court could determine "that a reasonable jury would not find the expert's opinion persuasive because it was too speculative, was too equivocal,

---

[6] This is not to say that an expert witness could not lie on the stand, just like any other witness. But concerns about the truth or falsity of an expert's testimony are addressed as part of the trial court's assessment of the reliability of the expert's testimony under Rule 702. See, e.g., *Elcock v. Kmart Corp.*, 233 F3d 734, 751 n.8 (3d Cir. 2000) (noting that the "fact that the expert lied about whether his methodology had been subjected to peer review, or intentionally understated the test's known rates of error" is a factor to be considered in determining Rule 702 reliability).

or did not stand up to the strength of other evidence in the record." *Debelbot v. State*, 305 Ga. 534, 541 (2019). See also *Shea*, 989 F3d at 278 (Where expert opinion testimony has been found admissible under Rule 702, "the factfinder cannot conclude that [the expert testimony] is true or false. Rather, it must determine the weight to give the opinion by considering whether it is plausible, coherent, and internally consistent, and not contradicted by extrinsic evidence." (citations and punctuation omitted)). But we have cautioned that "[t]his sort of assessment of the witness's 'credibility' is *at most* one factor to be considered … in determining how a reasonable juror would probably weigh the newly discovered evidence against the other evidence presented at trial." *Gates*, 308 Ga. at 260 n.19 (emphasis added).

To be sure, the materiality inquiry is a holistic one that must take into account the specific facts and circumstances of the case. See *Tanner v. State*, 247 Ga. 438, 443–44 (1981) ("Each case of newly discovered evidence must be judged on its own facts."). Because of this all-encompassing nature, it is difficult to predict in any given

case what facts and circumstances may be relevant to the materiality inquiry. Nevertheless, we have emphasized that the materiality analysis should include a consideration of "the strengths and weaknesses of both the State's and the defendant's case and the nature and strength of the defendant's new evidence." *Gates*, 308 Ga. at 260 (quotation marks omitted). See also id. at 259–64 (discussing how defendant's newly discovered evidence would have impacted jury's consideration of various items of "strong" inculpatory evidence presented by the State at trial); *Bowden v. State*, 250 Ga. 185, 187 (1982) (affirming finding of no materiality where defendant's newly discovered evidence constituted "very weak, if any, evidence" on contested issue of fact). The inquiry also may entail an assessment of how the evidence would impact the State's theory of the case, the theory of defense, or both, as well as whether the evidence might "suppl[y] the missing link" in the chain of evidence of guilt (or innocence). See, e.g., *Bell v. State*, 227 Ga. 800, 808 (1971); *Stinchcomb*, 308 Ga. at 880–81 (noting that "the only real question before the jury was whether [appellant] acted in

28

self-defense, and the evidence presented on that point was rather close" and discussing how new evidence factored into assessment of defense of self-defense); *Moody v. State*, 277 Ga. 676, 682 (2004) (concluding defendant failed to establish materiality where defendant failed to show that newly discovered evidence was relevant to his guilt or innocence). Importantly, even when the newly discovered evidence at issue "does not conclusively establish who committed a particular crime, it may nonetheless be probative evidence of a defendant's guilt or innocence" and thus material for purposes of *Timberlake*. *Gates*, 308 Ga. at 261; *Bell*, 227 Ga. at 807–08 ("[T]hat the verdict was authorized by the evidence adduced at the trial in no way precludes the probability of a different verdict on another trial with the newly discovered evidence, since the evidence merely *authorized*, but did not demand the verdict[.] … The State's evidence, while authorizing the verdict, was nevertheless not altogether satisfactory.").

Here, by relying exclusively on its own opinion of the experts' credibility in determining the materiality of Smith's newly

discovered evidence, the trial court erred. Instead, in considering materiality, the trial court should have considered how the evidence would have influenced the jury's consideration of the evidence introduced against Smith at his 2003 trial. On remand, the trial court should consider the materiality of Smith's evidence consistent with the framework outlined above and in our relevant decisional law.

For all these reasons, the trial court's decision denying Smith's extraordinary motion for new trial is vacated and this case is remanded for the trial court to consider Smith's motion within the appropriate legal framework, as outlined in this opinion.[7]

*Judgment vacated and case remanded. All the Justices concur.*

---

[7] Trial courts are permitted to adopt proposed orders prepared by a party to the litigation, even without alteration, as the trial court did here. See *Treadaway v. State*, 308 Ga. 882, 887 (2020) ("It is well established in Georgia that a trial court may request and adopt a proposed order from either party."). Indeed, the ability to adopt litigant-prepared orders is often vital to a trial court's efforts to efficiently manage its docket. That said, given that we have now vacated both orders entered by the trial court in this case, both of which uncritically adopted drafts prepared by the State, we encourage the trial court to proceed with care before pursuing the same approach on remand. And given that Smith's motion has now been pending for nearly five years, we encourage the trial court and the parties to proceed with dispatch.